ORAL ARGUMENT SCHEDULED FOR APRIL 25, 2024
CASE NO. 23-1248

IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

COALITION FOR RENEWABLE NATURAL GAS,

*Petitioner,*

v.

ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

————————

ON PETITION FOR REVIEW FROM THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY

————————

**FINAL OPENING BRIEF OF PETITIONER**

Of Counsel:
David Cox, General Counsel
Coalition for Renewable Natural Gas
1017 L Street, #513
Sacramento, CA 95814

Sandra P. Franco
Franco Environmental Law LLC
600 Pennsylvania Ave., SE
Unit 15577
Washington, DC 20003
sandra@francoenvironmentallaw.com

Jonathan Y. Ellis
McGuireWoods LLP
888 16th Street NW, Suite 500
Washington, DC 20006
Tel: (202) 857-1700
Fax: (202) 857-1737
jellis@mcguirewoods.com

*Counsel for Coalition for Renewable Natural Gas*

**Dated: March 12, 2024**

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), Petitioner provides the following list of parties to this case, rulings under review, and related cases:

1.    Parties and Amici

This is a matter on petition for review of an agency action. There was no action in the district court, and so there were no parties in the district court. The parties in this Court in this petition for review (Case No. 23-1248) are:

**Petitioner:**

Coalition for Renewable Natural Gas and

**Respondent:**

U.S. Environmental Protection Agency.

Case No. 23-1248 was consolidated with Case No. 23-1177, et al., on September 12, 2023. [Doc. #2016460] On November 16, 2023, American Fuel & Petrochemical Manufacturers, American Petroleum Institute, Clean Fuels Alliance America, Renewable Fuels Association, and Growth Energy were granted intervention in the consolidated cases.[1] [Doc. #2027447] On November 27, 2023, this Court severed Case No. 23-1248 and ordered any intervenor/respondent in Case

_____

[1] Coalition for Renewable Natural Gas also intervened in support of EPA in the consolidated case, but is not an intervenor in Case No. 23-1248.

No. 23-1177 et al. who wishes to participate in Case No. 23-1248 to notify the Court within 30 days of that date. [Doc. #2028670] No such notice was filed.

2.    Rulings Under Review

This case challenges final agency action referred to as the Biogas Regulatory Reform Rule promulgated by the U.S. Environmental Protection Agency and published in the Federal Register Notice entitled "Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes," 88 Fed. Reg. 44,468 (July 12, 2023).

3.    Related Cases

Petitioner is not aware of any pending cases challenging the Biogas Regulatory Reform Rule. Pursuant to this Court's order dated November 27, 2023, this case was severed from a consolidated case entitled *Center for Biological Diversity v. EPA*, Case No. 23-1177 (D.C. Cir.), which includes several consolidated challenges to other aspects of the Federal Register Notice entitled "Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes," 88 Fed. Reg. 44,468 (July 12, 2023).

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Coalition for Renewable Natural Gas ("RNG Coalition") makes the following disclosure:

RNG Coalition has no parent companies, and no publicly held company has a 10% or greater ownership interest. It has not issued shares or debt securities to the public.

RNG Coalition is a non-profit association of companies and organizations dedicated to the advancement of renewable natural gas as a clean, green, alternative, and domestic energy and fuel resource. It advocates on behalf of its members and provides education for the public in support of the sustainable development, deployment, and utilization of renewable natural gas, including participating in regulatory proceedings and litigation involving implementation of the Renewable Fuel Standard program by EPA, as well as other regulatory actions that may impact the renewable natural gas industry. RNG Coalition's membership includes companies throughout the value chain of waste feedstock conversion to transportation fuel under the Renewable Fuel Standard program. It is a "trade association" as defined in Circuit Rule 26.1(b).

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........C-1

RULE 26.1 CORPORATE DISCLOSURE STATEMENT................................C-3

TABLE OF AUTHORITIES ...................................................................................iv

GLOSSARY OF ACRONYMS AND ABBREVIATIONS..................................xi

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF ISSUES ....................................................................................1

STATUTES AND REGULATIONS.......................................................................2

STATEMENT OF THE CASE................................................................................2

STATEMENT OF FACTS ......................................................................................4

    A.    Renewable Natural Gas.........................................................................4

    B.    Proposed Biogas Reforms ....................................................................9

    C.    Final Biogas Reforms .........................................................................16

        *1.*    *Biogas Producer Requirements* ...............................................17

        *2.*    *Single Use Limitation*...............................................................19

        *3.*    *Continuous Measurement Requirements* .................................20

        *4.*    *Pipeline Quality Requirements* ................................................21

        *5.*    *"Leakage" as Reason for Retirement of RINs*........................22

        *6.*    *Changes in the Final Rule Not Included in the Proposal*........23

SUMMARY OF ARGUMENT ..............................................................................24

STANDING .............................................................................................................26

## TABLE OF CONTENTS
## (cont.)

Page

ARGUMENT ......................................................................................27

I.   STANDARD OF REVIEW ........................................................27

II.  THE REQUIREMENTS ON BIOGAS PRODUCERS EXCEED EPA'S
     AUTHORITY AND ARE ARBITRARY........................................28

     A.   EPA Impermissibly Seeks to Expand its Regulatory
          Authority ...................................................................29

     B.   Even if EPA had Some Authority to Regulate Biogas
          Producers, the Requirements Imposed on All Biogas
          Producers are Arbitrary............................................31

     C.   EPA's Limit on Uses of Biogas Exceeds its Authority
          and is Arbitrary ........................................................38

III. EPA'S TESTING AND MEASUREMENT REQUIREMENTS ARE
     ARBITRARY AND CAPRICIOUS .............................................40

     A.   Testing Requirements and Requirements Associated with
          Showing Compliance with Pipeline Specifications
          Exceed EPA's Authority and are Arbitrary .............40

     B.   EPA's Continuous Measurement Requirements are
          Arbitrary....................................................................44

IV.  EPA FAILED TO COMPLY WITH THE NOTICE AND COMMENT
     REQUIREMENTS FOR THE BIOGAS REFORMS .........................49

     A.   EPA's Proposal Failed to Provide Any Factual Support
          for a Number of its Provisions ..................................50

     B.   It is Not Sufficient for EPA to Merely Provide Proposed
          Regulatory Language to Meet its Procedural Obligations.......52

     C.   EPA Failed to Provide Notice or an Adequate
          Explanation for Several Provisions in the Final Rule..............54

# TABLE OF CONTENTS
## (cont.)

                                                                    **Page**

V.    In Light of the Numerous Questions Left Open by EPA
      Regarding the Biogas Reform Requirements, the
      Implementation Deadlines EPA Set are Also Arbitrary .........57

CONCLUSION AND REQUESTED REMEDY ...................................................57

CERTIFICATION OF COMPLIANCE .................................................................60

CERTIFICATE OF SERVICE ...............................................................................61

ADDENDUM

    Statutory and Regulatory Addendum

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Air Transp. Ass'n of Am. v. FAA*,
169 F.3d 1 (D.C. Cir. 1999)............................................................................51

*Alon Refining Krotz Springs, Inc. v. EPA*,
936 F.3d 628 (D.C. Cir. 2019)........................................................................27

*Am. Med. Ass'n v. Reno*,
57 F.3d 1129 (D.C. Cir. 1995)........................................................................52

*Am. Pub. Gas Ass'n v. DOE*,
72 F.4th 1324 (D.C. Cir. 2023).......................................................................57

*\*Ams. for Clean Energy v. EPA*,
864 F.3d 691 (D.C. Cir. 2017)..............................................................2, 31, 32

*Conn. Light & Power Co. v. Nuclear Regulatory Com.*,
673 F.2d 525 (D.C. Cir. 1982)........................................................................53

*Daimler Trucks N. Am. LLC v. EPA*,
737 F.3d 95 (D.C. Cir. 2013)....................................................................54, 56

*Envtl. Integrity Project v. EPA*,
425 F.3d 992 (D.C. Cir. 2005)...................................................................54, 55

*\*FCC v. Fox Television Stations*,
556 U.S. 502 (2009)..................................................................................45, 52

*Fund for Animals, Inc. v. Norton*,
322 F.3d 728 (D.C. Cir. 2003)........................................................................27

*Int'l Fabricare Inst. v. EPA*,
972 F.2d 384 (D.C. Cir. 1992)........................................................................28

*MCI Telecomms. Corp. v. FCC*,
57 F.3d 1136 (D.C. Cir. 1995)........................................................................26

# TABLE OF AUTHORITIES
## (cont.)

**Page(s)**

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983)..................................................................27, 44

*Nat'l Biodiesel Bd. v. EPA*,
843 F.3d 1010 (D.C. Cir. 2016).......................................................27

*Nat. Res. Def. Council v. EPA*,
777 F3d 456 (D.C. Cir. 2014).........................................................39

*Nebraska v. EPA*,
331 F.3d 995 (D.C. Cir. 2003).........................................................33

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*,
494 F.3d 188 (D.C. Cir. 2007).........................................................51

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015)....................................................................45

*Shell Oil Co. v. EPA*,
950 F.2d 741 (D.C. Cir. 1991).........................................................26

*Sierra Club v. EPA*,
292 F.3d 895 (D.C. Cir. 2002).........................................................27

*Sierra Club v. EPA*,
699 F.3d 530 (D.C. Cir. 2012).........................................................56

*Sierra Club v. EPA*,
705 F.3d 458 (D.C. Cir. 2013).........................................................31

*Small Refiner Lead Phase-Down Task Force v. EPA*,
705 F.2d 506 (D.C. Cir. 1983).........................................................50

*Sokol World Entm't, Inc. v. SBA*,
No. 21-cv-2385 (TSC), 2022 U.S. Dist. LEXIS 176412
(D.D.C. Sept. 28, 2022) ..............................................................24

*Solite Corp. v. EPA*,
952 F.2d 473 (D.C. Cir. 1991).........................................................51

# TABLE OF AUTHORITIES
## (cont.)

**Page(s)**

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec'y*,
  58 F.4th 506 (D.C. Cir. 2023)...............................................................30

*West Virginia v. EPA*,
  142 S.Ct. 2587 (2022)........................................................................30

*Weyerhaeuser Co. v. Costle*,
  590 F.2d 1011 (D.C. Cir. 1978).........................................................28

*Whitman v Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)...........................................................................30


### FEDERAL STATUTES AND LEGISLATIVE MATERIALS

5 U.S.C. §553(b) ...................................................................................55

5 U.S.C. §553(c) .............................................................................51, 55

Natural Gas Act, 15 U.S.C. §§717-717z...............................................6

42 U.S.C. §7545(c) ...............................................................................42

42 U.S.C. §7545(o) ...............................................................................26

42 U.S.C. §7545(o)(1)(B) .....................................................................28

42 U.S.C. §7545(o)(1)(I)..................................................................18, 32

*42 U.S.C. §7545(o)(2)(A) ...............................................................29, 30

42 U.S.C. §7545(o)(2)(B) ..............................................................7, 9, 29

42 U.S.C. §7545(u) ...............................................................................42

42 U.S.C. §7607(b)(1).............................................................................1

42 U.S.C. §7607(d) ...............................................................................56

**TABLE OF AUTHORITIES**
**(cont.)**

**Page(s)**

42 U.S.C. §7607(d)(3).................................................................50, 51, 55

42 U.S.C. §7607(d)(8).........................................................................28

42 U.S.C. §7607(d)(9)....................................................................27, 28

42 U.S.C. §7607(h) ..............................................................................55

Energy Independence and Security Act of 2007, Pub. L. No. 110-140,
 121 Stat. 1492 (2007)....................................................................26

S. Rep. No. 110-65 (2007) .............................................................26, 32

**ADMINISTRATIVE MATERIALS**

15 C.F.R. §287.1 ...................................................................................46

15 C.F.R. §287.2 ...................................................................................45

*15 C.F.R. §287.4 .................................................................................46

40 C.F.R. §80.2 .......................................................................10, 32, 55

40 C.F.R. §80.105 ...........................................................................12, 33

40 C.F.R. §80.105(a)............................................................................33

40 C.F.R. §80.105(f).............................................................................33

40 C.F.R. §80.105(j).............................................................................36

40 C.F.R. §80.105(k) ......................................................................38, 39

40 C.F.R. §80.110(f)..............................................................19, 22, 41, 44

40 C.F.R. §80.135(b) ......................................................................33, 43

40 C.F.R. §80.135(d) ......................................................................43, 44

**TABLE OF AUTHORITIES**
**(cont.)**

**Page(s)**

40 C.F.R. §80.140(b) ...............................................................................33

40 C.F.R. §80.145(a)................................................................................41

40 C.F.R. §80.145(c)................................................................................41

40 C.F.R. §80.155(a).............................................................21, 33, 44, 48

40 C.F.R. §80.155(b) ..........................................................................41, 42

40 C.F.R. §80.155(f) ................................................................................55

40 C.F.R. §80.165(c).........................................................................41, 42, 44

40 C.F.R. §80.185(c)................................................................................31

40 C.F.R. §80.1415(b) .............................................................................24

40 C.F.R. §80.1426(f) ..............................................................................32

40 C.F.R. §80.1426, Table 1 ...............................................12, 18, 28, 29

40 C.F.R. §80.1432 ..................................................................................22

40 C.F.R. §80.1434(a).......................................................................15, 22, 53

40 C.F.R. §80.1450(b) ...............................................................................7

40 C.F.R. §80.1454(c)..............................................................................32

40 C.F.R. §80.1454(d) .............................................................................32

40 C.F.R. §80.1464 ....................................................................................8

40 C.F.R. §80.1469 ....................................................................................8

40 C.F.R. §80.1469(c)..............................................................................37

40 C.F.R. §80.1469(e)................................................................................8

40 C.F.R. §80.1472 ....................................................................................8

## TABLE OF AUTHORITIES
## (cont.)

Page(s)

40 C.F.R. §80.1476 .................................................................................10

74 Fed. Reg. 56,260 (Oct. 30, 2009).......................................................47

79 Fed. Reg. 42,078 (July 18, 2014).........................................................8

79 Fed. Reg. 42,128 (July 18, 2014)......................................................7, 9

85 Fed. Reg. 7016 (Feb. 6, 2020) ..........................................................22

87 Fed. Reg. 80,582 (Dec. 30, 2022) .................. 9, 10, 11, 12, 13, 14, 15, 23, 53, 55

88 Fed. Reg. 44,468 (July 12, 2023)
.............. 1, 7, 11, 13, 16, 17, 18, 20, 21, 23, 24, 27, 34, 38, 40, 41, 45, 48, 49, 55

EPA, *An Introduction to Renewable Natural Gas* (2022), *available at*
  https://www.epa.gov/system/files/documents/2022-
  11/RNG_Intro_Guide.pdf .................................................................6

EPA, *An Overview of Renewable Natural Gas from Biogas* (2020),
  *available at* https://www.epa.gov/sites/default/files/2020-
  07/documents/lmop_rng_document.pdf.............................................42

Jan. 20, 2023 EPA Letter to RNG Coalition, *available at*
  https://www.epa.gov/system/files/documents/2023-01/rfs-req-
  comment-ext-nprm-2023-2025-crng-epa-response-2023-01-20.pdf .................16

OMB Circular A-119 (2016), *available at*
  https://www.nist.gov/system/files/revised_circular_a-
  119_as_of_01-22-2016.pdf.................................................................46

# TABLE OF AUTHORITIES
## (cont.)

**Page(s)**

### MISCELLANEOUS

Definition of "unable," Collins Dictionary,
https://www.collinsdictionary.com/dictionary/english/unable ...........................48

Coalition for Renewable Natural Gas, *Calculators and Common
Conversions – RNG Conversions*,
https://www.rngcoalition.com/calculators-conversions (last visited
Nov. 28, 2023) ........................................................................................24

Saeid Mokhatab et al., *Handbook of Natural Gas Transmission and
Processing* (Fourth Ed.) (2019) ...........................................................6

AUTHORITIES CHIEFLY RELIED UPON ARE INDICATED BY AN ASTERISK (*)

# GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| ASTM | ASTM International |
| Btu | British thermal units |
| CNG | Compressed natural gas |
| EMTS | EPA Moderated Transaction System |
| EPA | U.S. Environmental Protection Agency |
| HHV | Higher heating value |
| LHV | Lower heating value |
| LNG | Liquified natural gas |
| Million Btu | MMBtu |
| NTTAA | National Technology Transfer and Advancement Act |
| OMB | Office of Management and Budget |
| Petitioner | Coalition for Renewable Natural Gas |
| RFS | Renewable Fuel Standard |
| RIN | Renewable Identification Number |
| RNG | Renewable Natural Gas |

## JURISDICTIONAL STATEMENT

This Petition for Review challenges the Biogas Regulatory Reform Rule ("Biogas Reforms") promulgated by the U.S. Environmental Protection Agency ("EPA") under the Clean Air Act and published on July 12, 2023 as part of "Renewable Fuel Standard (RFS) Program: Standards for 2023-2015 and Other Changes," 88 Fed. Reg. 44,468. The petition was timely filed, and this Court has jurisdiction under 42 U.S.C. §7607(b)(1).

## STATEMENT OF ISSUES

1)      Whether EPA exceeded its authority or acted arbitrarily in imposing burdensome and unnecessary regulatory requirements on biogas producers that create disincentives to sell their feedstock for production of transportation fuel.

2)      Whether EPA exceeded its authority or acted arbitrarily in requiring demonstrations of compliance with pipeline specifications through testing and attest engagement audits that seek to ensure fuel quality outside of EPA's jurisdiction.

3)      Whether the continuous measurement requirements that restrict the industry's operational flexibility, are impractical, and provide no added benefit to the Renewable Fuel Standard program are arbitrary.

4)      Whether EPA is entitled to deference and the Biogas Reforms can stand when it provided insufficient legal and factual support (if any) for many

1

requirements and failed to provide the public with a meaningful opportunity to comment.

## STATUTES AND REGULATIONS

Relevant statutes and regulations appear in an addendum to this brief.

## STATEMENT OF THE CASE

In establishing the Renewable Fuel Standard, Congress created a "market forcing" program that requires increasing amounts of biofuels be sold in the transportation fuel market each year. *Ams. for Clean Energy v. EPA*, 864 F.3d 691, 705, 710 (D.C. Cir. 2017). In response to the Renewable Fuel Standard, the renewable natural gas industry made substantial investments, growing from 140 million ethanol-equivalent gallons in 2015 to over 560 million in 2021. EPA-HQ-OAR-2021-0427-0756 at 8 (JA411). Over 1.8 billion in additional capacity is projected by 2025, reaching over 500 facilities. *Id.* at 7, 11 (JA410, JA414).

Currently, under the program, renewable natural gas is sold in the transportation fuel market as compressed natural gas ("CNG") and liquified natural gas ("LNG"). EPA-HQ-OAR-2021-0427-0213 at 1 (JA320). However, renewable natural gas also can be used to produce other biogas-derived fuels, such as renewable electricity, sustainable aviation fuel, hydrogen, and methanol, which also should be eligible to participate. Toward those ends, the Biogas Reforms establish a new system to track Renewable Identification Numbers ("RINs") generated for

renewable natural gas ("RNG RINs") through EPA's moderated transaction system ("EMTS") to help ensure volumes are ultimately used for transportation fuel. Although requiring sweeping changes to contracts and business models established under pre-existing regulations, this tracking was intended to provide oversight to protect against double counting and fraud with the expansion of the program to include other biogas-derived fuels.

However, the Biogas Reforms go well beyond those provisions needed to implement this tracking system. Despite the investments already made in reliance of the Renewable Fuel Standard, several of the new requirements make substantial changes to how the entire renewable natural gas supply chain should operate, imposing new burdens and liability risk on parties not previously regulated. EPA largely claims these requirements are necessary to provide oversight because *renewable natural gas* is fungible with fossil natural gas. But the new RNG RIN tracking system will track these volumes, and the renewable natural gas industry is already subject to substantial, third-party oversight through participation in EPA's own Quality Assurance Program, which provides checks on volumes claimed for RIN generation against third-party pipeline custody information that is also subject to federal and state oversight.

Further, certain provisions impose undue burdens on biogas producers and limit the operational flexibility required to address the different needs of the variety

of biogas sources and renewable natural gas facilities that are in operation and that are being developed. These burdens create disincentives for these parties to participate in the Renewable Fuel Standard program and, thereby, potentially adversely impact the ability to meet the minimum volume requirements and to realize the greenhouse gas emissions reductions benefits of these projects. Raising nothing more than mere speculation based on nothing more than conclusory statements, EPA failed to provide any analysis or make a rational connection (if one was provided at all) to its claimed need for the Biogas Reforms generally with many of the specific requirements. These burdensome requirements are patently unreasonable in light of Congress's directive to *promote* production of renewable fuels and *ensure minimum volumes* are sold or introduced into the transportation fuel market. Petitioner Coalition for Renewable Natural Gas ("Petitioner") is challenging several aspects of these Biogas Reforms that exceed EPA's authority, are arbitrary, or otherwise not in accordance with law.

## STATEMENT OF FACTS

### A.    Renewable Natural Gas

Organic waste is a fact of life. There are thousands of aggregated organic waste sites across North America. EPA-HQ-OAR-2021-0427-0756 at 11 (JA414). The decomposition of organic waste produces biogas, which is readily distinguishable from natural gas because the methane content is much lower, due to

the presence of carbon dioxide, nitrogen, and other contaminants "which cannot be tolerated if it is to be put into a natural gas pipeline or used by fleet vehicles at the landfill site."[2] EPA-HQ-OAR-2021-0427-1113 at 406 (JA533).

Renewable natural gas is fuel derived from biogas that has been captured from organic waste streams—including agricultural wastes, municipal wastewater, and municipal solid waste in landfills—and upgraded to remove the contaminants that may be present to achieve quality standards necessary to substitute for fossil natural gas. EPA-HQ-OAR-2021-0427-0213 (JA320-322). Agricultural operations and landfills are significant sources of methane, which is a potent greenhouse gas. EPA-HQ-OAR-2021-0427-0756 at 30-32 (JA416-418). EPA has acknowledged that "[u]se of biogas derived fuels in the transportation sector can substantially reduce [greenhouse gas] emissions and can serve to promote effective organic waste management, as well as efficient biogas production, recovery and utilization." *Id.* at 38 (quoting EPA, et al., *Biogas Opportunities Roadmap*, at 22 (2014), *available at* https://www.epa.gov/sites/default/files/2015-12/documents/biogas-roadmap.pdf) (JA424).

---

[2] Typically, biogas is about 50% methane, EPA-HQ-OAR-2021-0427-0031 at 1 (JA302), while natural gas is about 88-93% methane, EPA-HQ-OAR-2021-0427-0232 at 3 (JA335). Fossil natural gas also contains other hydrocarbons besides methane. EPA-HQ-OAR-2021-0427-0232 at 3 (JA335).

Because renewable natural gas is interchangeable with fossil natural gas, it can be used in existing infrastructure, including distribution through the existing natural gas pipeline system. EPA-HQ-OAR-2021-0427-1113 at 334-335 (JA530-531). Natural gas pipelines are regulated by other federal and state agencies. *See, e.g.,* 15 U.S.C. §§717-717z. Natural gas must be processed to meet quality standards set by the pipelines (and approved by regulators with jurisdiction) to be compatible with pipeline design and customer requirements. *See* Saeid Mokhatab *et al*., *Handbook of Natural Gas Transmission and Processing* (Fourth Ed.), §1.11 (2019); EPA-HQ-OAR-2021-0427-0213 at 1 (JA320). For renewable natural gas, this means removing carbon dioxide and impurities to produce high-grade fuel that is approximately 95% methane or greater. EPA-HQ-OAR-2021-0427-0223 at 4-8 (JA332). At interconnection facilities, gas quality is monitored prior to injection to ensure non-compliant gas does not enter the pipeline network. EPA, *An Introduction to Renewable Natural Gas*, at 1 (2022), *available at* https://www.epa.gov/system/files/documents/2022-11/RNG_Intro_Guide.pdf; EPA-HQ-OAR-2021-0427-0756 at 59-61, 85 (JA441-443, JA467); EPA-HQ-OAR-2021-0427-0827 at 9-10 (JA356-357). Throughout the supply chain, "[a]ll parties have a vested interest in pipeline meter readings being accurate, and will naturally work in concert to ensure the volumes injected and withdrawn are accurate." EPA-HQ-OAR-2021-0427-0778 at 13 (JA476).

Renewable natural gas has been a success story under the Renewable Fuel Standard where Congress sought, in particular, to promote cellulosic biofuels. 42 U.S.C. §7545(o)(2)(B)(i)(III). In 2014, renewable CNG/LNG became eligible to generate Renewable Identification Numbers as cellulosic biofuel—D3 RINs.[3] 79 Fed. Reg. 42,128, 42,160 (July 18, 2014). Today, CNG/LNG make up almost 100% of D3 RIN generation. 88 Fed. Reg. at 44,481 (JA14).

Since 2014, renewable natural gas facilities have operated based on EPA's implementation of the regulations in Part 80, Subpart M, of Title 40 of the Code of Federal Regulations, which allow for renewable natural gas to be distributed through commercial pipelines. 79 Fed. Reg. at 42,144-42,145, 42,162 (40 C.F.R. §§80.1426(f)(10-11)). Registrations must be submitted to and accepted by EPA prior to generating RINs. 40 C.F.R. §80.1450(b). Registrations require a third-party engineering review of the facility and information regarding the fuel's production process from biogas to CNG/LNG distribution and the protocol for RIN generation, including how renewable natural gas volumes are measured to determine the number of RINs to be generated. *Id.*; 79 Fed. Reg. at 42,144-42,145, 42,163 (40 C.F.R. §80.1450(b)(1)(v)(D)); EPA-HQ-OAR-2021-0427-0778 at 13 (JA476).

---

[3] RINs represent ethanol-equivalent gallons and are used by obligated parties to show compliance with their volume obligations.

Because of the "buyer beware" approach to RIN validity, EPA also finalized its RIN Quality Assurance Program in 2014, which is "intended to assure reasonable oversight of RIN generation and promote greater RIN liquidity in the RIN market." 79 Fed. Reg. 42,078, 42,078-42,079 (July 18, 2014). The Quality Assurance Program is voluntary, but "help[s] ensure that valid RINs are traded and used for compliance." *Id.* at 42,080. Under the Quality Assurance Program, independent auditors verify the validity of RINs generated based on EPA-approved Quality Assurance Plans. 40 C.F.R. §80.1469(e). This verification process includes site visits and reviews documentation regarding, among other things, the feedstock being used, the fuel being produced, natural gas consumption, and the RINs being generated (including third party utility statements) to identify errors or potentially invalid RINs. 40 C.F.R. §§80.1469, 80.1472; EPA-HQ-OAR-2021-0427-0628 at 2 (JA366); EPA-HQ-OAR-2021-0427-0697 at 2 (JA380). Around 99% of D3 RINs are verified under EPA's Quality Assurance Program, which likely represents virtually all of the renewable natural gas RINs. EPA-HQ-OAR-2021-0427-0756 at 53 (JA435). Mandatory attest engagements for all RIN generators also involve annual audits to confirm valid RIN generation. 40 C.F.R. §80.1464. These third-party audits have ensured the integrity of D3 RINs generated for renewable natural gas. EPA acknowledged the "lack of fraud being reported at present under the previous biogas provisions." EPA-HQ-OAR-2021-0427-1114 at 212 (JA538).

8

### B.    Proposed Biogas Reforms

The statute provided volume targets for cellulosic biofuels through 2022. 42 U.S.C. §7545(o)(2)(B)(i)(III). After 2022, EPA is charged with setting the volumes based on a review of implementation of the program and an analysis of a list of factors. *Id.* §7545(o)(2)(B)(ii). In December 2022, EPA published a proposal to set the volume requirements for compliance years 2023-2025, referred to as the "RFS Set Rule." 87 Fed. Reg. 80,582, 80,583 (Dec. 30, 2022) (JA128). With those volume requirements, EPA also proposed "a number of other regulatory changes intended to improve the operation of the RFS program." *Id.* Among these "other regulatory changes" were the Biogas Reforms.

In the Biogas Reforms, EPA proposed to change the process for generating and separating RINs for biogas-derived fuels. Under the pre-existing rules, EPA provided for flexibility as to which party generates RINs for CNG/LNG, so long as the party can establish that biogas was used to produce the renewable natural gas and CNG/LNG was produced for use as transportation fuel. 79 Fed. Reg. at 42,144-42,145. This was generally done through a series of contracts and affidavits that were submitted to EPA. *Id.* Having the RIN generator oversee the entire process and provide all necessary documentation was deemed to "help ensure that the company registering to generate RINs will only generate RINs for fuel that is fully compliant with all regulatory requirements." *Id.* at 42,145. Since the renewable natural gas was

required to be contracted for use as CNG/LNG to generate RINs, RINs were typically separated upon sale to a CNG/LNG distributor and could then be used for compliance or sold into the RIN market. 87 Fed. Reg. at 80,695 (JA240).

Recognizing that biogas could be used to produce other renewable fuels in addition to CNG/LNG,[4] EPA determined that the "current regulatory program" was not "well-suited" to avoid the double counting of biogas and renewable natural gas. 87 Fed. Reg. at 80,693 (JA238). Citing the "existing program's complexity," EPA proposed changes it asserted "would provide a more comprehensive, yet streamlined, tracking and oversight program for biogas and RNG." *Id.* The proposed reforms "centered on the movement of biogas that is upgraded to RNG and then injected onto the natural gas commercial pipeline for later use as transportation fuel." *Id.* at 80,694 (JA239).

Along those lines, EPA proposed to establish a new "RNG RIN" program under a new Subpart E where only renewable natural gas producers can generate

---

[4] For example, biogas can be used to produce a biointermediate that could then be used to produce renewable fuel. 40 C.F.R. §80.2. EPA already establish regulations for biointermediate producers. *See* 40 C.F.R. §80.1476. Not considered a "biointermediate," renewable natural gas can be used as a feedstock for production of, for example, renewable electricity, hydrogen, sustainable aviation fuel, and other liquid fuels. EPA-HQ-OAR-2021-0427-0756 at 49 (JA431). To date, however, EPA has not approved any RIN generation for these other biogas-derived fuels.

RINs for renewable natural gas.[5] 87 Fed. Reg. at 80,694 (JA239). RINs generated remain "assign[ed]" until natural gas is withdrawn from the pipeline, eliminating the need to track volumes through contracts for the sale of biogas, renewable natural gas, and RINs for purposes of the Renewable Fuel Standard program. *Id.* A party that can demonstrate an equivalent volume of gas withdrawn from the pipeline is used as CNG/LNG for transportation fuel would then separate the assigned RNG RINs and those separated RINs can then be sold into the RIN market.[6] *Id.* at 80,694-80,695 (JA239-240). While these revisions require sweeping changes to existing contracts and business models and do not necessarily "streamline" the industry's operations due to the nature of natural gas distribution and sales, EPA at least explained that this eliminates the complexity of tracing volumes through a series of contracts that may result in fraudulent RIN generation.[7] *Id*. at 80,695-80,696 (JA240-241); 88 Fed. Reg. at 44,528-44,529 (JA61-62).

---

[5] Under the Biogas Reforms, renewable natural gas refers only to upgraded biogas injected into a commercial pipeline system. 88 Fed. Reg. at 44,532 (JA65). When not injected into a commercial pipeline, upgraded biogas is called "treated biogas" and regulated as "biogas under a closed distribution system." *Id.*; *see also id.* at 44,527 (JA60).

[6] If the renewable natural gas is used to produce another renewable fuel, such as sustainable aviation fuel, the RNG RIN would be retired, and new RINs generated based on the volumes of fuel produced. 87 Fed. Reg. at 80,695 (JA240).

[7] While supportive of including other biogas-derived fuels, the renewable natural gas industry largely opposed the Biogas Reforms because it believed the existing oversight was sufficient to maintain the program's integrity even with this

The Biogas Reforms, however, included numerous, additional requirements with little to no explanation as to how those provisions reasonably achieve EPA's stated goals (if at all). Unlike for any other approved feedstock, *see* 40 C.F.R. §80.1426, Table 1, EPA proposed to impose requirements directly on the feedstock provider—here, biogas producers. 87 Fed. Reg. at 80,696 (JA241). Biogas producers include municipal landfills, dairy farms, municipal wastewater treatment plants, among others. EPA-HQ-OAR-2021-0427-0756 at 55-56 (JA437-438). These entities would now be required to register, submit monthly reports, keep numerous records, comply with product transfer documents and sampling and testing requirements, and undergo annual attest engagements. *See generally* 40 C.F.R. §80.105.

EPA also proposed that biogas producers only be allowed to supply biogas for one designated use under the Renewable Fuel Standard program. 87 Fed. Reg. at 80,721 (proposed 40 C.F.R. §80.105(k)) (JA266). For example, a large landfill that can have several collection systems with separate upgrading and distribution equipment could only sell any biogas from the landfill (a) to be used in a closed

---

expansion, and because of the reduced flexibility and changes required to businesses built around pre-existing regulations. EPA-HQ-OAR-2021-0427-0756 at 52-54 (JA434-436). Nonetheless, Petitioner does not challenge the RIN generation and RIN separation provisions for purposes of tracking RINs for renewable natural gas.

distribution system for one use (e.g., CNG/LNG or as a biointermediate)[8] or (b) to be upgraded to renewable natural gas for pipeline injection. *Id.*

EPA also proposed to specify testing and measurement procedures for biogas and renewable natural gas. 87 Fed. Reg. at 80,675 (JA220). The proposal listed specific types of equipment that must be used to continuously measure biogas and renewable natural gas. *Id.* at 80,733 (proposed 40 C.F.R. §80.165) (JA278). To explain the continuous measurement provisions, EPA only referenced it was codifying non-binding 2016 guidance that was not subject to public comment. *Id.* at 80,675 (JA220). That guidance, however, merely indicated that *after treatment* in-line gas chromatographs "should" be used to measure renewable natural gas for RIN generation, but this did not apply to biogas (or CNG/LNG), did not require meeting any particular specifications as in the proposed rule, and allowed for alternatives to using in-line gas chromatographs. EPA-HQ-OAR-2021-0427-0048 at 3 (JA318). The guidance also recognized the role of the Quality Assurance Program to ensure ongoing compliance. *Id.* at 4 (JA319).

---

[8] EPA deferred finalizing provisions regarding renewable electricity RIN generation. 88 Fed. Reg. at 44,471 (JA4). When finalized and under this single use limitation, that same large landfill could not generate RINs for production of renewable electricity and for production of CNG/LNG. *Id*. at 44,540-44,541 (JA73-74). Several sites, however, have already invested in multi-uses of their biogas in anticipation of EPA's approval of renewable electricity RINs. EPA-HQ-OAR-2021-0427-0792 at 24 (JA485); EPA-HQ-OAR-2021-0427-1145 at 6-7 (JA592-593).

EPA also proposed to require annual testing of a number of constituents using specified test methods, including methane, carbon dioxide, nitrogen, oxygen, hydrogen sulfide, total sulfur, siloxanes, moisture, hydrocarbon analysis, heating value and relative density, additional components specified in the pipeline specifications "or specified by EPA as a condition of registration," and carbon-14 analysis. 87 Fed. Reg. at 80,676 (JA221), 80,722-80,723 (proposed 40 C.F.R. §80.120(f)(iii)) (JA267-268), 80,733 (proposed 40 C.F.R. §80.165(b)) (JA278). Also, without explanation, EPA proposed to require that any attest engagement report "as a finding any batches with reported values that did not meet pipeline specifications." *Id.* at 80,736 (proposed 40 C.F.R. §80.175(e)(4)(iii)) (JA281).

The registration process can be time-consuming. It is longstanding industry practice to store renewable natural gas at off-site physical gas storage sites connected with the pipeline system. EPA-HQ-OAR-2021-0427-0665 at 8-9 (JA374-375). EPA has allowed RIN generation for renewable natural gas stored off-site pending EPA's approval of registration "in large part due to the length of time it has taken EPA to review and accept registrations." 87 Fed. Reg. at 80,699-80,700 (JA244-245). Ignoring the impracticality of storing renewable natural gas on-site compared to liquid fuels, EPA explained that it does not allow off-site storage for other fuels and, therefore, was removing this allowance for renewable natural gas. *Id.*

At best, EPA's explanation for all aspects of the reforms was a general claimed need for additional oversight to protect against fraud and double counting. At worst, EPA provided no explanation at all. For example, 40 C.F.R. §80.1434(a) lists the types of actions that may require retirement of RINs. Without explanation, EPA added "leakage" as a reason for retirement in proposed regulatory language. 87 Fed. Reg. at 80,747 (JA292). This change was not included in EPA's list of "technical corrections and clarifications." *Id.* at 80,708 (JA253). EPA's silence as to the meaning of this change was deafening where "leakage" was identified as a concern related to gaseous fuels (e.g., CNG/LNG and hydrogen). *Id.* at 80,611 (JA156), 80,692 (JA237).

In light of the substantial third-party oversight regarding renewable natural gas and the lack of reported fraud to date, the public naturally called into question the need for the reforms at all. *See, e.g.,* EPA-HQ-OAR-2021-0427-0756 at 52-54 (JA434-436); EPA-HQ-OAR-2021-0427-0627 at 12-13 ("EPA has proposed significant changes to how RNG is regulated under the RFS that will be disruptive to the existing market and that will take time to implement. [American Petroleum Institute] believes that EPA should maintain the existing regulatory structure for RNG.") (JA362-363); EPA-HQ-OAR-2021-0427-0812 at 27 ("The proposed changes will penalize the current participants in the biogas and RNG value chain who have developed compliance strategies and business arrangements that have

resulted in the generation of the vast majority of D3 cellulosic biofuel RINs over the history of the RFS.") (JA491).

Because of these substantial new requirements, the diverse operations of its membership, and the limited factual and legal basis provided, Petitioner requested additional time to submit comments on the Biogas Reforms. EPA-HQ-OAR-2021-0427-0420 (JA338-341). EPA denied that request, referring to a consent decree setting a June 2023 deadline for issuing the 2023 volume requirements even though the proposed Biogas Reforms would not apply in 2023 and were not a subject of the consent decree. *See* Jan. 20, 2023 EPA Letter to RNG Coalition, *available at* https://www.epa.gov/system/files/documents/2023-01/rfs-req-comment-ext-nprm-2023-2025-crng-epa-response-2023-01-20.pdf

### C.    Final Biogas Reforms

Although EPA has not approved the use of renewable natural gas to produce any other fuel aside from CNG/LNG, EPA finalized the Biogas Reforms largely as proposed in July 2023 under the guise that the reforms are needed to facilitate inclusion of other biogas-derived fuels. 88 Fed. Reg. at 44,522 (JA55). EPA again asserted that the reforms "will also substantially help improve oversight of the program and mitigate against the potential for parties to double-count biogas and RNG given the program's expansion [to allow for other biogas-derived fuels],

thereby helping to ensure that only valid RINs are generated for biogas-derived renewable fuels." *Id.*

But it was not until the response to comments that EPA even attempted to explain why particular provisions "help[ed]" to meet EPA's claimed goals. These explanations, however, were not based on any factual support or risk analysis. EPA reviews and accepts all registrations, and has access to RIN generation information. It would not have required much to provide some data or analysis to help explain EPA's concerns. For example, EPA provided an analysis of engineering reviews used to compare potential biogas producer registrants to renewable natural gas producer registrants. EPA-HQ-OAR-2021-0427-1060 (JA521-525). This document was not provided with the proposal and is mostly redacted. *Id.* But, this shows that EPA could have done a review of the information *in its possession* to explain its concerns or beliefs that *all of the Biogas Reforms* are necessary and consider potential implications to ensure they are reasonable to achieve its goals.

### 1.    *Biogas Producer Requirements*

In response to comments opposing the burdensome requirements on biogas producers, EPA asserted that it was "critical" for EPA's oversight and enforcement "for parties that choose to produce biogas under the RFS program to be held responsible for complying with the regulations, because the biogas producer is the party best able to demonstrate that the biogas was produced from renewable biomass

17

under an EPA-approved pathway." 88 Fed. Reg. at 44,533 (JA66). EPA's approved

pathways only specify biogas from landfills, municipal wastewater treatment facility

digesters, agricultural digesters, separated municipal solid waste digesters, and other

waste digesters. 40 C.F.R. §80.1426, Table 1. EPA "did not propose to revisit or

reopen the pathways for biogas established" in the 2014 rule. 88 Fed. Reg. at 44,527

(JA60).

Importantly, these operations do not "choose to produce biogas under the RFS

program," as EPA claims. Organic wastes at these operations produce biogas. The

Renewable Fuel Standard program provides an opportunity to turn that biogas into

a transportation fuel, providing an alternative, more circular and sustainable waste

management tool and reducing greenhouse gas emissions from these operations.

This is like other renewable feedstocks where the Renewable Fuel Standard provides

an additional potential market for farmers to sell, for example, their corn. But, unlike

other feedstocks, such as planted crops that must come from existing agricultural

lands or biomass obtained from the immediate vicinity of buildings at risk of

wildfire, 42 U.S.C. §7545(o)(1)(I), it is not difficult to show the biogas production

co-located or connected to a gas treater occurred at a landfill, an agricultural digester,

or a wastewater treatment plant digester.

Only in response to comments did EPA express its speculative (and

unsupported) concern that biogas can be mixed with fossil natural gas (which is

18

volatile and requires infrastructure to be distributed) prior to being upgraded.[9] EPA-HQ-OAR-2021-0427-1114 at 250 (JA547). But biogas is markedly different from fossil natural gas, and the party upgrading the biogas also must monitor the biogas volumes being upgraded to ensure proper operations of its system, which are designed to handle biogas not fossil natural gas. *See, e.g.,* 40 C.F.R. §80.110(f)(2).

2.    *Single Use Limitation*

In response to comments opposing the single use limitation for biogas production facilities, EPA acknowledged that "in real-world applications there may often not be a perfect match between biogas production capacity and the quantity of biogas for a particular use," but that this single use limitation serves the purpose of "minimizing program complexity and safeguarding against double counting." 88 Fed. Reg. at 44,540 (JA73). While the "complexity" appears to be of EPA's own making, as public comments explained, biogas is collected and measured using separate meters for each designated use that ensures against double counting. EPA-HQ-OAR-2021-0427-0756 at 45-46 (JA427-428); EPA-HQ-OAR-2021-0427-0709 at 12-13 (JA385-386); EPA-HQ-OAR-2021-0427-0827 at 5 (JA352). EPA again speculated that the biogas producer could manipulate the data, ignoring, of course,

---

[9] EPA-HQ-OAR-2021-0427-0232 at 4 ("Natural gas is highly combustible at low levels of concentration (4 to 16 percent of volume).") (JA336).

that the renewable natural gas producer measures and can report the flow of biogas *actually received*. EPA-HQ-OAR-2021-0427-1114 at 320 (JA585).

3.    *Continuous Measurement Requirements*

In response to "[m]ultiple" comments opposing the onerous and inflexible continuous measurement requirements, EPA simply asserted that "federal regulations based on the National Technology Transfer and Advancement Act (NTTAA) state that agencies should give *preference* to standardized measurement techniques," rather than allow use of manufacturer recommendations, and the standards listed "can" be used for biogas and renewable natural gas. 88 Fed. Reg. at 44,535 (citing 15 C.F.R. §287.4(f)) (emphasis added) (JA68).

EPA essentially dismissed public comments stating that these are not standard in the biogas or renewable natural gas industry, stating that "[c]ommenters did not provide standards for the alternative measurement devices that they recommend EPA allow." 88 Fed. Reg. at 44,535 (JA68). But the public did refer to a list of EPA-approved measurement techniques for biogas. EPA-HQ-OAR-2021-0427-1145 at 4-5 (JA590-591). Additional flow meter standards were also identified. EPA-HQ-OAR-2021-0427-0735 at 9 (JA396). Public comments also referenced provisions in California's Low Carbon Fuel Standard that provided standard accuracy and reliability provisions to obtain consistent measurements. EPA-HQ-OAR-2021-0427-0778 at 12-13 (JA475-476).

EPA then claimed it was addressing the industry's concerns by allowing for alternative measurement protocols. EPA-HQ-OAR-2021-0427-1114 at 277 (JA563). But these can be sought *only if* the ones specified are *unable* to be used. 40 C.F.R. §80.155(a)(3). Further, EPA must approve these alternative measurement protocols as part of the registration process, which can only take place after procurement, installation, and commercial operation, and will likely (again) delay registrations. Yet, EPA continued to prohibit RIN generation for renewable natural gas stored off-site pending registration approval, claiming that it is streamlining the registration process eliminating the need for such allowance. 88 Fed. Reg. at 44,539 (JA72).

### 4.    *Pipeline Quality Requirements*

In response to comments opposing EPA monitoring of gas being of "pipeline quality," EPA agreed that it need not "accept" the pipeline specifications being used as it proposed. 88 Fed. Reg. at 44,531-44,532 (JA64-65), EPA-HQ-OAR-2021-0427-1145 at 6 (JA592). However, EPA continues to assert testing and requirements related to pipeline specifications are needed to ensure that the renewable natural gas conforms to those specifications. EPA-HQ-OAR-2021-0427-1114 at 258-259 (JA555-556). But, this is ensured by the fact that the pipeline (as regulated by FERC or the state counterpart) allowed the gas to be injected. 88 Fed. Reg. at 44,524 (JA57). As noted above, there are several safeguards that ensure upgrading can and

does occur, including third-party engineering reviews, ongoing monitoring by the renewable natural gas producer and third-party pipeline meters, as well as quarterly checks under the Quality Assurance Program. Moreover, EPA acknowledged that annual testing was not necessary, but the final rule continues to require it. EPA-HQ-OAR-2021-0427-1114 at 286 (JA572); 40 C.F.R. §80.110(f)(2)(iii).

### 5.    *"Leakage" as Reason for Retirement of RINs*

In response to comments questioning the unexplained addition of "leakage" as a reason to retire RINs under 40 C.F.R. §80.1434(a)(5), EPA referenced the requirement to retire RINs for spills of liquid fuels, stating that it "only added the term 'leakage' ... to clarify the terminology as it pertains to RNG for use when retiring RINs in the EMTS system." EPA-HQ-OAR-2021-0427-1114 at 230-231 (JA545-546). But, Section 80.1434 merely organized the provisions that require retirement of RINs elsewhere, and there is no other regulation explaining "leakage" or identifying when retirement of RINs is required for "leakage." 85 Fed. Reg. 7016, 7063 (Feb. 6, 2020). *Cf.* 40 C.F.R. §80.1432 (regarding reported spillage or disposal of renewable fuel). As EPA acknowledges, an RNG RIN separator "can only separate RINs from the volume of renewable CNG/LNG used as transportation fuel." EPA-HQ-OAR-2021-0427-1114 at 230 (JA545). What leakage then is EPA trying to address? This illustrates the many unanswered questions as to what the Biogas Reforms require, much less *why.*

22

### 6.    Changes in Final Rule Not Included in the Proposal

EPA included new regulatory language in the final rule that did not follow proper notice and comment procedures. For example, in the final rule, EPA added a requirement that continuous measurements be "recorded" in certain intervals, which was not included in the proposal nor was it explained in the final rule beyond a mere reference that this change was added in response to concerns raised about data collection in public comments. 88 Fed. Reg. at 44,557 (JA90); EPA-HQ-OAR-2021-0427-1114 at 282-283 (JA568-569). But the industry does not know what this new requirement means.

EPA also added "renewable CNG/LNG" to Section 80.155(a) that requires continuous measurements using in-line gas chromatographs and specified flow meters. *Compare* 87 Fed. Reg. at 80,733 (proposed 40 C.F.R. §80.165(a)) (JA278)*, with* 88 Fed. Reg. at 44,574 (40 C.F.R. §80.155(a)) (JA107). EPA provided no notice or explanation for this change. Where RINs are based on the methane in the gas volumes injected and withdrawn from the pipeline, EPA was required to explain how the onerous continuous measurement requirements are applicable to CNG/LNG, which merely change the form of the gas to allow it to be pumped for vehicle use.

EPA also added, throughout the final rule, reference to energy values (BTUs) being reported as "higher heating value" or "lower heating value," adding a wholly

23

new requirement that any conversion between "HHV" and "LHV" be based on ASTM D3588. 88 Fed. Reg. at 44,575 (40 C.F.R. §80.155(f)) (JA108). ASTM D3588 addresses methane calculations, where the industry has long been using conversions based on a natural gas calculations. This new conversion reduces the volumes used to determine RIN generation.[10] Although this changes longstanding industry practice (included in EPA-accepted registrations and Quality Assurance Program reviews), these changes, again, were not referenced in the proposal and not explained in the final rule.

## SUMMARY OF ARGUMENT

The Biogas Reforms appear to stem from EPA's belief that it can impose any regulatory obligations it wants on the renewable natural gas industry because they "voluntarily" participate in the Renewable Fuel Standard program. EPA attempts to claim broad authority based on Congress's directive that EPA ensure the volume requirements are met. But, this directive did not extend to feedstock providers and

---

[10] Under 40 C.F.R. §80.1415(b)(5), 77,000 Btu LHV of renewable natural gas is equivalent to 1 RIN. Based on this and to convert HHV to LHV, the industry has been using a conversation factor that results in 1 MMBtu equaling 11.727 RINs. Coalition for Renewable Natural Gas, *Calculators and Common Conversions – RNG Conversions*, https://www.rngcoalition.com/calculators-conversions (last visited Nov. 28, 2023). Using ASTM D3588 reduces the number of RINs per 1 MMBtu. This information is being provided as background information needed to determine if EPA acted arbitrarily. *See Sokol World Entm't, Inc. v. SBA*, No. 21-cv-2385 (TSC), 2022 U.S. Dist. LEXIS 176412, at *11 (D.D.C. Sept. 28, 2022) (citing *Daikin Applied Americas, Inc. v. EPA*, 39 F.4th 701, 716-17 (D.C. Cir. 2022)).

does not relate to fuel quality standards. Moreover, EPA appears to ignore that the Renewable Fuel Standard program was designed to *promote* biofuels, including biogas-derived fuels. It cannot be that, in trying to facilitate entry of biofuels into the transportation fuel market and biofuels invested based on that anticipated market entry, Congress also sought to grant EPA broad authority to impose overly burdensome regulatory requirements throughout the biofuel supply chain.

Even if such broad authority could somehow be read into the statute, the requirements EPA imposes on biogas producers, the single use limitation for biogas producers, and the testing and measurement requirements are arbitrary. The revisions to how RINs are tracked (in addition to all the third-party oversight over the industry) is more than sufficient to meet EPA's asserted goals. EPA has provided no risk assessment or data to show otherwise. Instead, supported only by speculation and conclusory statements, the challenged provisions merely add bells on top of whistles without providing any meaningful additional assurances that the renewable natural gas is eligible to generate RINs. Moreover, they tie the hands of the industry and, due to a significant change in the economic calculus, are more likely to disincentivize participation in the transportation fuel market than ensuring those volumes are available. In other words, they are counter to Congress's directive to *promote* renewable fuel use in the transportation fuel market and cannot be reasonable under the statute.

EPA's asserted policy claims based on its "experience" also are not entitled to deference due to its failure to follow proper procedures. EPA believes that because it expressed its claim that the regulations generally were needed to mitigate against double counting and fraud, it met its procedural obligations. But, waiting until the response to comments to provide any explanation as to why it believed certain requirements were necessary and then blaming the public for not providing sufficient information to assuage its concerns is indicative of the "bureaucratic game of hide and seek" it played throughout the Biogas Reforms. *MCI Telecomms. Corp. v. FCC*, 57 F.3d 1136, 1142 (D.C. Cir. 1995). "Interested parties cannot be expected to divine the EPA's unspoken thoughts," particularly when the requirements are a significant departure from pre-existing regulations on which the industry has long relied and the new requirements made little sense in the real (versus theoretical) world. *Shell Oil Co. v. EPA*, 950 F.2d 741, 751 (D.C. Cir. 1991) (citation omitted). EPA's failure to follow proper procedure should not be condoned.

## STANDING

The Renewable Fuel Standard promotes production of biofuels, including biogas-derived fuels. *See* 42 U.S.C. §7545(o); Pub. L. No. 110-140, 121 Stat. 1492; S. Rep. No. 110-65 at 2-3 (2007). Petitioner represents the entire supply chain for renewable natural gas, from feedstocks suppliers to developers, owners, and operators of renewable natural gas facilities to distributors of renewable natural gas

and CNG/LNG. EPA-HQ-OAR-2021-0427-0962_attachment_1 at 295 (JA505).

These companies participate in the Renewable Fuel Standard program and are

directly impacted by the Biogas Reforms. *See, e.g., id.* at 34-35 (JA494-495), 58

(JA497), 200-203 (JA501-504); EPA-HQ-OAR-2021-0427-0962_attachment_2 at

131-140 (JA509-518); 88 Fed. Reg. at 44,524 (JA57). As the targets of EPA's

regulations, their standing is "self-evident." *Fund for Animals, Inc. v. Norton*,

322 F.3d 728, 733-734 (D.C. Cir. 2003); *see also Sierra Club v. EPA*, 292 F.3d 895,

899-900 (D.C. Cir. 2002) ("petitioner's standing to seek review of administrative

action is self-evident … if the complainant is 'an object of the action … at issue'");

*Alon Refining Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 664-665 (D.C. Cir. 2019);

*National Biodiesel Board v. EPA*, 843 F.3d 1010, 1015 (D.C. Cir. 2016).

Participation of individual members in the litigation is not necessary.

## ARGUMENT

### I.   STANDARD OF REVIEW

The Clean Air Act requires the Court to determine whether the agency's

actions were arbitrary and capricious, an abuse of discretion, in excess of statutory

authority, or otherwise not in accordance with law. *See* 42 U.S.C. §7607(d)(9). The

arbitrary and capricious standard requires the agency to examine the relevant factors

and articulate a satisfactory explanation for its action. *Motor Vehicle Mfrs. Ass'n of

the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). "A

conclusory statement, of course, does not in itself provide the 'satisfactory explanation' required in rulemaking." *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 392 (D.C. Cir. 1992) (citation omitted).

In reviewing procedural errors, the Court may invalidate the rule if there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made. 42 U.S.C. §7607(d)(8-9). Further, the D.C. Circuit has stated that it will defer to an agency "so long as we are assured that its promulgation process as a whole and in each of its major aspects provides a degree of public awareness, understanding, and participation commensurate with the complexity and intrusiveness of the resulting regulations." *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1028 (D.C. Cir. 1978) (citation omitted).

## II. THE REQUIREMENTS ON BIOGAS PRODUCERS EXCEED EPA'S AUTHORITY AND ARE ARBITRARY.

Congress recognized that biogas produced through conversion of organic matter from renewable biomass is an "advanced biofuel." 42 U.S.C. §7545(o)(1)(B)(ii)(V). To generate RINs under EPA's regulations, EPA must approve a fuel pathway, which identifies the fuel type, the feedstock, the production process requirements, and the applicable D Code.[11] 40 C.F.R. § 80.1426, Table 1.

---

[11] The D Code determines which renewable fuel category the fuel may be used to show compliance. A D3 RIN represents a cellulosic biofuel while a D5 RIN represents a non-cellulosic advanced biofuel.

EPA has approved biogas from landfills, municipal wastewater treatment facility digesters, agricultural digesters, separated municipal solid waste digesters, and other waste digesters as feedstock for renewable CNG/LNG. *Id.* (Pathways Q & T). As noted above, there are thousands of organic waste sites that produce biogas across the United States. Many of these sites are owned and operated by local municipalities. *See, e.g.,* EPA-HQ-OAR-2021-0427-0962_attachment_1 at 34 (JA494). To provide biogas for transportation fuel, the Biogas Reforms now directly regulate these sites, imposing substantial new requirements. Under the Renewable Fuel Standard, however, Congress did not give EPA broad authority to regulate feedstock suppliers. Even if it somehow did, the burdensome and duplicative requirements for biogas producers are arbitrary.

## A. EPA Impermissibly Seeks to Expand its Regulatory Authority.

To help biofuels compete with petroleum, Congress mandated increasing volumes of renewable fuel be incorporated into the transportation fuel market, particularly cellulosic biofuels. 42 U.S.C. §7545(o)(2)(B). Congress directed EPA to issue regulations to "ensure that transportation fuel sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains at least the applicable volume of renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel." *Id.* §7545(o)(2)(A)(i). A departure from the "buyer beware" liability scheme, EPA

29

claims this directive gives it broad authority to regulate the entire renewable fuel supply chain to impose substantial new requirements on biogas producers. EPA-HQ-OAR-2021-0427-1114 at 7 (JA535). However, "[a]gencies may exercise only the authority granted by Congress and such authority cannot be conferred by silence." *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec'y*, 58 F.4th 506, 509 n.1 (D.C. Cir. 2023) (dissenting op.) (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress.")). "'Congress could not have intended to delegate' such a sweeping and consequential authority 'in so cryptic a fashion.'" *West Virginia v. EPA*, 142 S.Ct. 2587, 2608 (2022) (citation omitted); *see also Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes.").

Citing its duty to "ensure" the volumes, EPA ignores that these regulations are to impose compliance obligations on "refineries, blenders, distributors, and importers, as appropriate." 42 U.S.C. §7545(o)(2)(A)(iii). "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia*, 142 S.Ct. at 2607 (quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)). The statute places parameters on the regulations established to implement the volume requirements because Congress was seeking to force changes in the *fuel*

30

supply chain to incorporate renewable fuels, not to regulate renewable feedstock suppliers. This makes sense where Congress sought to incentivize use of a diverse source of renewable feedstocks, not place more hurdles on their use.

And EPA cannot create new authority. *See Sierra Club v. EPA*, 705 F.3d 458, 469 (D.C. Cir. 2013) ("Because the statute leaves no room for exemptions, such as those at issue, granting the permitting authorities discretion to apply the exemption is beyond the EPA's statutory authority."); *Ams. for Clean Energy*, 864 F.3d at 710 (finding EPA had no authority to base waiver on demand when statute referenced supply). That EPA is seeking to go beyond any potential authority under the Renewable Fuel Standard is further evidenced by the requirement to report to EPA any potential that a biogas producer is also seeking credit under a non-transportation fuel program. 40 C.F.R. §80.185(c)(1)(i)(D). This is not EPA's job to police. If the renewable natural gas producer establishes that biogas was used to produce transportation fuel, EPA cannot take enforcement actions with respect to these other programs.

Because the numerous requirements on biogas producers exceed EPA's authority, they must be vacated.

### B.    Even if EPA had Some Authority to Regulate Biogas Producers, the Requirements Imposed on All Biogas Producers Are Arbitrary.

In establishing the Renewable Fuel Standard, Congress sought to overcome challenges to biofuels becoming "a cornerstone of U.S. efforts to improve national

energy security" and "a significant factor in displacing petroleum use." S. Rep. No. 110-65 at 2-3. It is intended to be market forcing by creating "incentives to increase renewable fuel supplies and overcome constraints in the market." *Ams. for Clean Energy*, 864 F.3d at 700 (quoting 80 Fed. Reg. 77,420, 77,423 (Dec. 14, 2015)).

Since 2014, the RIN generator for CNG/LNG was required to provide the information necessary to show the fuel was produced from biogas under an approved pathway. 40 C.F.R. §§80.1426(f)(10-11), 80.1454(c), (d). This was like other renewable fuels, including crop-based fuels for which the feedstock must come from agricultural land that was cleared or cultivated prior to December 19, 2007. 42 U.S.C. §7545(o)(1)(I). Surely it is more difficult to obtain documentation to show a particular grain of corn came from eligible land than it is to show biogas connected to upgrading equipment came from a landfill or digester.[12] Indeed, EPA established an aggregate compliance approach for U.S. based crops to facilitate making this showing, yet, here EPA chose to impose substantial new requirements on "[a]ny

---

[12] EPA attempts to distinguish biogas from other feedstocks, such as corn used for ethanol, by pointing to the fungibility of *renewable natural gas* and fossil natural gas and the ability to use biogas as a biointermediate. EPA-HQ-OAR-2021-0427-1114 at 256 (JA553). But, *biogas* is easily distinguishable from *natural gas*, and undenatured ethanol can also be used as a biointermediate. 40 C.F.R. §80.2. Moreover, renewable diesel includes fuels that meet ASTM D975, which is the specification that applies to petroleum diesel, and may also be distributed by pipelines. *Id.*; EPA-HQ-OAR-2021-0427-1019 at 1 (JA519).

biogas producer that produces biogas" used to produce renewable natural gas or a biogas-derived fuel. 40 C.F.R. §80.105(a)(1).

The new requirements are onerous. They include registration, reporting, recordkeeping, product transfer document, and attest engagement requirements. 40 C.F.R. §80.105. The registration requirements include a third-party engineering review, which must be updated every three years. *Id.* §80.135(b)(3), (4). Biogas producers must continuously measure the volume of biogas and submit monthly reports of biogas production. *Id.* §§80.105(f), 80.140(b). As further discussed below, these continuous measurements must be done through certain in-line gas chromatographs and certain flow meters that are not typically used for biogas. *Id.* §80.155(a); EPA-HQ-OAR-2021-0427-0480 at 2 (JA343). EPA itself determined a substantial increase in compliance costs for biogas producers, estimating over $4 million in annual costs for an estimated 196 respondents. EPA-HQ-OAR-2021-0427-1111_attachment_1, Tab I (JA527-528).[13] This likely does not account for the increased costs due to the continuous measurement requirements. EPA-HQ-OAR-2021-0427-1145 at 4-5 (JA590-591). It cannot be that, in directing EPA to ensure increased volumes, Congress also intended to grant EPA broad authority to impose

---

[13] This is compared to $154,129 in total costs for an estimated 5,408 biogas feedstock producers under the prior regulations. EPA-HQ-OAR-2012-0401-0043 at 11 (JA604). This Court may take judicial notice of EPA data. *Nebraska v. EPA*, 331 F.3d 995, 998 n.3 (D.C. Cir. 2003).

substantial requirements on feedstock providers that create disincentives to production of cellulosic biofuels.[14]

Where the Renewable Fuel Standard is trying to *promote* participation of renewable fuels in the transportation fuel market, EPA's defense of imposing such substantial requirements is that "feedstock providers' participation in the RFS program is completely voluntary," claiming the only difference with the Biogas Reforms is that, rather than providing information to RIN generators, "the biogas producer will supply that information directly to EPA." EPA-HQ-OAR-2021-0427-1114 at 8 (JA536). This is incorrect. There are registration, engineering reviews, reporting, recordkeeping, testing and measurement, product transfer documents, and attest engagement requirements—all of which require time and money. It also imposes substantial new liability risks. What's worse is that landfills, wastewater treatment plants, and agricultural operations may return to flaring or go back to allowing methane to simply enter the atmosphere than take on those costs and that liability. *See* EPA-HQ-OAR-2021-0427-0031 at 3 ("[M]ethane emissions from MSW landfills represent a lost opportunity to capture and use a significant energy resource.") (JA304). EPA arbitrarily ignored these important aspects of the problem.

---

[14] This is not speculation. Until recently, regulatory hurdles have largely prevented corn kernel fiber ethanol and biogas from mixed digesters from substantially participating in the program. 88 Fed. Reg. at 44,483 (JA16), 44,544 (JA77).

Rather than assessing the potential implications of these requirements for the program and ensuring volumes will be available for the transportation fuel market, EPA simply makes unsupported, conclusory statements to dismiss public comments. For example, EPA implies there is no problem here because the municipality that owns the landfill or wastewater treatment plant or the farmer that supplies agricultural wastes would only do so if it makes sense economically.[15] EPA-HQ-OAR-2021-0427-1114 at 8 (JA536). EPA provides no factual basis or analysis to support these claims. Record evidence explained that these entities did not believe they had the resources to comply with the prior requirements even when they could generate RINs. EPA-HQ-OAR-2021-0427-0628 at 1 (JA365). Renewable fuel production is outside their core business, and smaller entities are likely not to be equipped to engage in all the regulatory requirements. *See* EPA-HQ-OAR-2021-0427-0752 at 2 (JA399). Even if they could hire third parties to do the reporting, this does not address the additional liability risks. Importantly, for renewable natural gas, biogas producers *do not generate RINs* under the Biogas Reforms, and, in such circumstances, it is unclear what economics EPA believes would support incurrence

---

[15] EPA also says that someone besides the municipality that owns the landfill or wastewater treatment plant or the farmer that supplies agricultural wastes could register under its definition of "biogas producer." Petitioner's best guess as to who that might be is the renewable natural gas producer, which undermines EPA's claim that the biogas producer *must* participate in the Renewable Fuel Standard program.

of the substantial new regulatory costs and liability risks by biogas producers. Or why, because some biogas producers may still participate, this supports Congress's overall goals of increasing biofuel production.

EPA then attempts to claim that biogas producers are "in the best position to ensure the feedstocks being used qualify." EPA-HQ-OAR-2021-0427-1114 at 256 (JA553). But EPA is *only* requiring information on the biogas streams being collected.[16] This is likely because it is not difficult to show that the biogas comes from a landfill or digester. And EPA does not identify what information is only available to the biofuel producer that cannot be obtained from the renewable natural gas producer. As public comments explained, measuring biogas output provides no different information than is provided in measuring biogas input into a renewable natural gas facility. EPA-HQ-OAR-2021-0427-0709 at 11-12 (JA384-385).

At best, EPA speculates that fossil natural gas *could* be mixed with biogas, requiring biogas producers to register. EPA-HQ-OAR-2021-0427-1114 at 250 (JA547). As noted above, biogas is markedly different from fossil natural gas, which is highly volatile and requires infrastructure to distribute. The upgrading process is

---

[16] Where certain organic wastes are deemed by EPA as non-cellulosic (e.g., separated food waste), biogas from mixed digesters may be required to provide information to properly allocate between D3 and D5 RINs. 40 C.F.R. §80.105(j). This does not obviate the need for operators of mixed digesters to register, much less to require all biogas producers to register.

monitored throughout to ensure the pipeline specifications will be met, and fossil natural gas, which has different constituents than biogas, could affect those processes. Simply assuming RIN prices would incentivize biogas producers to mix fossil fuel, EPA provides no explanation for how biogas producers could mix biogas with fossil natural gas in light of the risks and difficulties in doing so or why existing processes, such as third-party site visits, review of utility bills, and monitoring of gas through the upgrading process, would not identify changes in the gas flow sufficient to detect such behavior. Further, the Quality Assurance Program provides third-party verification of the feedstock being used.[17] 40 C.F.R. §80.1469(c)(1). EPA provides no valid explanation why this is not sufficient to ensure the renewable natural gas is derived from biogas, asserting only that imposing substantial new requirements and liability risks on biogas producers is "essential for a program that can be effectively overseen and enforced." EPA-HQ-OAR-2021-0427-1114 at 250 (JA547). This is belied by the fact that the program has been effectively overseen and enforced for CNG/LNG to date.

In short, there is no actual *need* for these requirements beyond potentially easing EPA's administrative burdens to oversee the program (despite the buyer

---

[17] Despite once touting the Quality Assurance Program, EPA now claims that this is not a "replacement for an overseeable regulatory program." EPA-HQ-OAR-2021-0427-1114 at 256 (JA553). Even if true, this does not explain why it is not sufficiently reasonable to ensure the RINs being generated are valid.

beware nature of the program and the additional new registrants and reports). But, potentially alleviating administrative burdens is not sufficient to impose undue regulatory hurdles that may disincentivize those parties Congress sought to incentivize to support biofuel production. As such, there are more than sufficient grounds to vacate the new requirements imposed on biogas producers as arbitrary.

## C.    EPA's Limit on Uses of Biogas Exceeds its Authority and is Arbitrary.

While claiming to be establishing regulations to allow for multiple uses of renewable natural gas, the Biogas Reforms limit biogas producers to "supplying biogas or treated biogas for a single use (e.g., RNG, renewable CNG/LNG, or to produce a biointermediate)." 88 Fed. Reg. at 44,540 (JA73); 80 C.F.R. §80.105(k)(1). EPA cites to no statutory authority to support its restrictions on biogas producer's operations, contending that this limitation "serves the goals of minimizing program complexity and safeguarding against double counting by eliminating the opportunity for double counting in the first place." 88 Fed. Reg. at 44,540 (JA73).

We assume EPA again is claiming broad authority to "ensure" the volumes are met with eligible fuel. But EPA acknowledged that this requirement may "lead to some volumes not to be used under RFS." EPA-HQ-OAR-2021-0427-1114 at 317 (JA582); *see also* EPA-HQ-OAR-2021-0427-0709 at 12-13 (JA385-386). This renders any goal to "minimize program complexity" to be counter to Congress'

directives. EPA must ground its reasons in the statute. *Nat. Res. Def. Council v. EPA*, 777 F3d 456, 468-69 (D.C. Cir. 2014). EPA can point to no statutory authority to exclude eligible fuel from participating in the program.

EPA's contention that the single use limitation helps avoid double counting is similarly misplaced. EPA essentially confirmed that an auditor can verify the biogas volumes actually used to guard against double counting, rendering the single use limitation unnecessary (as well as the need to require biogas producers register in the first instance). EPA-HQ-OAR-2021-0427-1114 at 316 (JA581). EPA states that, if biogas can only go to one use, the biogas producer cannot overstate the volumes that they send to two different uses. *Id.* But EPA does not explain how these volumes can be overstated *for purposes of RIN generation* that is based on measured volumes *actually used.* Where EPA is required to ensure the minimum volumes are met, its express prohibition on eligible volumes from participating exceeds its authority and, at a minimum, is arbitrary. For these reasons, the single use limitation in 40 C.F.R. §80.105(k)(1) must be vacated.

A similar restriction is the limitation that a biogas producer can only sell biogas as a biointermediate to one renewable fuel producer in 40 C.F.R. §80.105(k)(2) suffers a similar defect and also should be vacated. As comments explained, this limitation could leave assets stranded, disincentivizing biogas

producers from having the biogas used as a biointermediate, defeating the purpose of allowing these pathways. EPA-HQ-OAR-2021-0427-0756 at 46 (JA428).

## III. EPA'S TESTING AND MEASUREMENT REQUIREMENTS ARE ARBITRARY AND CAPRICIOUS.

EPA contends that RIN values create incentives to manipulate testing and measurement results to appear to have produced more biogas, renewable natural gas, and biogas-derived renewable fuels, and asserts that clear and consistent testing and measurement requirements can ensure validity of RINs and a level playing field for RIN generators. 88 Fed. Reg. at 44,534 (JA67). EPA largely claimed to be codifying non-binding guidance that did not undergo notice-and-comment rulemaking. *Id.* But RINs are generated for renewable natural gas, not biogas, and those RINs are based on the volume of "biomethane." Yet, EPA requires testing of various constituents in biogas and renewable natural gas. And, regarding the so called "clear and consistent" measurement requirements, the record does not establish any connection between EPA's claimed need and the actual requirements.

### A. Testing Requirements and Requirements Associated with Showing Compliance with Pipeline Specifications Exceed EPA's Authority and are Arbitrary.

The final rule includes provisions that relate to monitoring renewable natural gas's compliance with pipeline specifications. This includes requiring a renewable natural gas producer to annual test biogas and renewable natural gas and requiring auditors conducting attest engagements of renewable natural gas operations to report

40

to EPA any instances of not meeting pipeline specifications. 40 C.F.R. §§80.110(f)(2)(iii), 80.165(c)(4)(iii). EPA also finalized recordkeeping requirements related to test results and findings of off-specification fuel. *See* 40 C.F.R. §80.145(c)(5) (results of any laboratory analysis of chemical composition or physical properties), (6) (documents supporting the composition of biogas and RNG and cleanup of biogas for each batch), (11) (documentation of any waiver provided by the natural gas commercial pipeline system for any parameter of the RNG that does not meet the natural gas specifications submitted with registration).[18] These requirements all relate to ensuring the applicable pipeline specifications are being met, but EPA nowhere explains how these requirements are necessary to protect against attempts to claim an increase in biomethane for generation of RINs.

Instead, it is clear that EPA is seeking to regulate "product quality." 88 Fed. Reg. at 44,535 (JA68). Although EPA claims it is not establishing a natural gas standard specification, as there is no one standard (and EPA likely understands that is outside its jurisdiction),[19] EPA-HQ-OAR-2021-0427-1114 at 259 (JA556), EPA's broad regulation gives it authority to require testing of any additional components as a condition of registration. 40 C.F.R. §80.155(b)(2)(vii). It also requires testing

---

[18] This is in addition to retaining any records and copies of notifications related to potentially inaccurate or non-qualifying biogas volumes. 40 C.F.R. §80.145(a)(1)(viii).

[19] This renders EPA's claim that it is trying to level the playing field a red herring.

41

of constituents using specific methods that might not be required under the applicable pipeline specifications and can take time and resources to obtain.[20] *Id*. §80.155(b)(2); EPA-HQ-OAR-2021-0427-1114 at 287 (JA573). Requiring testing of components outside the applicable pipeline specifications using standard testing methods no one requires indicates that EPA is seeking to regulate fuel quality. But EPA cites to no such authority. Nor can it. *Cf*. 42 U.S.C. §§7545(u) (regarding fuel specifications for biodiesel), 7545(c) (requiring endangerment finding to regulate fuels).

EPA admits that it is requiring testing for 3-year updates "to ensure that the facility is producing RNG that conforms with [pipeline] specifications." EPA-HQ-OAR-2021-0427-1114 at 259 (JA556). And while, EPA somehow states that it "did not propose and are not finalizing that RNG quality and pipeline specifications be reviewed as part of the attest engagement," the final regulations require the auditor conducting an attest engagement to report "as a finding any batches with reported values that did not meet the natural gas specifications" in the registration. *Id.*; 40 C.F.R. §80.165(c)(4)(iii). This requirement makes no sense where, as EPA

---

[20] For example, Carbon-14 dating is wholly unnecessary to ensure renewable natural gas is "capable" of being used as transportation fuel. As another example, siloxane is not typically found in wastes from agricultural operations. EPA, *An Overview of Renewable Natural Gas from Biogas*, at 24 (2020), *available at* https://www.epa.gov/sites/default/files/2020-07/documents/lmop_rng_document.pdf; *supra* n.10

acknowledges, "RNG that does not meet applicable fuel quality specifications prescribed by the pipeline operator may still qualify as RNG." EPA-HQ-OAR-2021-0427-1114 at 292 (JA578).

Even if these requirements do not overstep EPA's authority regarding fuel quality, these requirements provide no benefit to the program's integrity and are arbitrary. Pipeline operators monitor gas being injected into the pipeline system to ensure compliance with those specifications. *See, e.g.,* EPA-HQ-OAR-2021-0427-0724 at 4 (JA392). When the RINs are generated based on actual injection into the pipeline, EPA can provide no explanation why EPA must also monitor compliance with pipeline specifications through costly and extensive testing or an attest engagement to confirm the renewable natural gas conforms to the specifications. Indeed, EPA recognized that annual testing is not necessary, indicating it was removing annual sampling and testing requirements (although such removal did not actually occur). EPA-HQ-OAR-2021-0427-1114 at 286 (JA572). It is also unclear why, when a third-party engineering review is required to confirm a facility's operations and RINs are verified on a quarterly basis under a Quality Assurance Program, comprehensive testing of a list of constituents that may be unrelated to the applicable pipeline specifications, whether annually or every three years, is needed at all. 40 C.F.R. §80.135(b)(3), (d)(6).

43

For the foregoing reasons, provisions related to monitoring or testing for compliance with pipeline specifications (e.g., 40 C.F.R. §§80.110(f)(2)(iii), 80.135(d)(6), 80.165(c)(4)(iii)) must be vacated.

### B.    EPA's Continuous Measurement Requirements are Arbitrary.

Section 80.155(a) requires that biogas, renewable natural gas, and renewable CNG/LNG be continuously measured using (a) an in-line gas chromatograph meeting ASTM D7164 and (b) an orifice flow meter, vortex flow meter, or a thermal mass (capillary) flow meters meeting listed specifications. 40 C.F.R. §80.155(a). Yet, similar to the testing requirements, nowhere does EPA explain why the types of equipment and the listed specifications that must be met are necessary to ensure against manipulation of measurements. In other words, EPA does not provide a rational connection between the record and these requirements. *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43. Moreover, EPA ignored relevant factors, rendering its actions arbitrary.

Aside from essentially a recommendation that in-line gas chromatographs be used to measure renewable natural gas, the specific requirements in Section 80.155(a) were not included in the 2016 guidance EPA claims to be codifying. And, EPA has accepted registrations based on several different types of equipment being

44

used,[21] and the industry has relied on those registrations for years (confirmed through the Quality Assurance Program). The U.S. Supreme Court has found that an agency must provide more substantial justification when "its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account. It would be arbitrary or capricious to ignore such matters." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015) (quoting *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009)).

Rather than explain its departures from longstanding policy implemented through the registration process, EPA contends that the National Technology Transfer and Advancement Act states that "agencies should give preference to standardized measurement techniques." 88 Fed. Reg. at 44,535 (citing 15 C.F.R. §287.4(f)) (JA68). EPA then asserts that these are standards "that can be used in the measurement of methane concentration and flow of biogas and RNG." *Id.* This does not explain, however, why they should be used.

The regulation cited by EPA relates to federal conformity assessments—the demonstration that specified requirements relating to a product, process, system, person, or body are fulfilled. 15 C.F.R. §287.2. Assuming its applicability here, these

---

[21] Indeed, EPA has not identified any facility that is currently registered and has been generating RINs under the program that uses the specific equipment it is requiring.

regulations do not "preempt the agencies' authority and responsibility to make decisions authorized by statute or required to meet regulatory procurement, or programmatic objectives and requirements." *Id.* §287.1(c). Moreover, the regulations do not provide that this "preference" take precedence over all other considerations, telling the agency to develop and implement conformity assessment in a manner that "reduces unnecessary complexity for stakeholders." *Id.* §287.4(b). The agency is also to consider leveraging other agency actions and private sector programs. *Id.* §287.4(e). Importantly, EPA was also required to provide the public with an opportunity to comment on the rationale for its decision. *Id.* §287.4(c).

While the regulation notes a "preference for using voluntary consensus standards, guides, and recommendations," it also refers to OMB Circular A-119, which outlines numerous considerations for an agency to assess when determining the appropriate use of industry standards. *See* 15 C.F.R. §287.4(f); OMB Circular A-119 (2016), *available at* https://www.nist.gov/system/files/revised_circular_a-119_as_of_01-22-2016.pdf. The record is devoid of any of this analysis.

Instead, the record is replete with information calling into question the appropriateness of the standards EPA chose. Public comments questioned the need for and applicability of these specific meters to measure biogas and renewable natural gas and explained that other flow meters and gas analyzers are more typically used by the industry and are reliable and accurate. EPA-HQ-OAR-2021-0427-0792

46

at 23-24 (JA484-485); EPA-HQ-OAR-2021-0427-0752 at 2 (JA399). EPA, in particular, ignored concerns regarding the feasibility of using in-line gas chromatographs meeting ASTM D7164 for biogas, contending only that the "standard still appears to apply to biogas." EPA-HQ-OAR-2021-0427-1114 at 277-278 (JA563-564).

EPA also ignored information provided by the industry regarding other available measurement protocols, including those adopted by EPA under the greenhouse gas reporting rule that "provide for accurate emission estimates at a reasonable cost burden to reporters" 74 Fed. Reg. 56,260, 56,337 (Oct. 30, 2009); EPA-HQ-OAR-2021-0427-1145 at 4-5 (JA590-591); EPA-HQ-OAR-2021-0427-0735 at 9 (JA396). Other comments referenced regulations under California's Low Carbon Fuel Standard that ensure accuracy in gas metering without specifying particular equipment but providing the consistency in measurement EPA claims was needed. EPA-HQ-OAR-2021-0427-0778 at 12-13 (JA475-476). And EPA ignored that CNG/LNG RIN generators have relied on third-party meters owned and operated by pipeline operators for which they have no access or ability to change to ensure compliance with EPA's requirements. *See id.* at 11-13 (JA474-476); EPA-HQ-OAR-2021-0427-0651 at 10 (JA369). Where the pipeline's business is based on accurate readings of custody transfers of gas, EPA raised no concerns with their reliability. EPA merely asserted that the public provided no other alternatives and it

47

found no other appropriate standards, except one additional *European* standard for flow meters. 88 Fed. Reg. at 44,535 (JA68). This is a wholly insufficient explanation to impose costly regulatory obligations on an entire industry, tying its hands when flexibility is needed to address the variety of conditions these facilities operate under. EPA cannot ignore a significant aspect of a problem and claim reasoned decision-making.

EPA may contend that it did consider these comments, pointing to a provision not in the proposal that allows for submission of alternative measurement protocols for approval by EPA. 40 C.F.R. §80.155(a)(3). But EPA provides no explanation of alternative methods it may approve. Indeed, the criteria for seeking an alternative measurement protocol appear difficult to meet where the party must show that the specified equipment are "unable" to be used to continuously monitor.[22] *Id.* Something may be able to be used, but there may be many reasons why it is infeasible or impractical to do so. Moreover, despite the options provided by the public, EPA claimed it found no similar standards it could use, indicating this may be a very narrow exception.

_____

[22] "If you are unable to do something, it is impossible for you to do it...." Definition of "unable," Collins Dictionary, https://www.collinsdictionary.com/dictionary/english/unable.

48

Based on the history of delays in EPA's registration process, this "alternative measurement protocol" approval process may delay registration and, thereby, the ability to generate RINs. EPA all but admits that its registration process has taken a long time and does not dispute that RINs from these early operations can impact a plant's viability. EPA-HQ-OAR-2021-0427-0628 at 1-2 (JA365-366); *see also* EPA-HQ-OAR-2021-0427-0651 at 9 (JA368); EPA-HQ-OAR-2021-0427-0724 at 3-4 (JA391-392). Despite this, EPA made no changes to its prohibition on off-site storage pending registration, which it claimed was unnecessary because it was streamlining the registration process. 88 Fed. Reg. at 44,539-44,540 (JA72-73). EPA's retention of this prohibition on off-site storage for purposes of generating RINs in light of this new, untested, and unexplained alternative that requires EPA approval was arbitrary.

For these reasons, the continuous measurement requirements and the off-site storage prohibition should also be vacated.

## IV. EPA FAILED TO COMPLY WITH THE NOTICE AND COMMENT REQUIREMENTS FOR THE BIOGAS REFORMS.

EPA will likely seek deference to ask this Court to rely on EPA's "experience" to support its conclusory and speculative claims regarding the need for these provisions to ensure proper oversight. *See* 88 Fed. Reg. at 44,524 (JA57). Due to EPA's failure to provide sufficient notice to ensure meaningful comment, however, it is not entitled to such deference.

49

As this Court has found, notice serves three functions:

> First, notice improves the quality of agency rulemaking by ensuring that agency regulations will be "tested by exposure to diverse public comment." .... Second, notice and the opportunity to be heard are an essential component of "fairness to affected parties." .... Third, by giving affected parties an opportunity to develop evidence in the record to support their objections to a rule, notice enhances the quality of judicial review....

*Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983) (citations omitted). EPA's proposal failed on all these grounds. Indeed, EPA's final rule included provisions for which no notice was provided at all, despite the change from long-standing practice that has been approved through the registration process and has been long-relied on by the industry. These were not mere harmless errors. EPA's failure to provide for meaningful comment has resulted in substantial new regulatory burdens on an industry that EPA is directed to support. It was incumbent on EPA to ensure it provided sufficient explanation in support of its proposal and the final rule.

### A.    EPA's Proposal Failed to Provide Any Factual Support for a Number of its Provisions.

EPA's proposal violates the notice and comment requirements of the Clean Air Act. A notice of proposed rulemaking requires "a statement of its basis and purpose." 42 U.S.C. § 7607(d)(3). Under the Clean Air Act, this must include (1) the factual data on which the proposed rule is based, (2) the methodology used in

obtaining the data and in analyzing the data, and (3) the major legal interpretations and policy considerations underlying the proposed rule. *Id.* The purpose is to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. §553(c), *quoted in Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007). Indeed, despite EPA's failure to provide sufficient explanation in the proposal, it nonetheless blames the public for failing to provide sufficient information to change EPA's mind.

EPA appears to believe just asserting a need to ensure against fraud and double counting is enough to meet its procedural obligations. "An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991) (citation omitted); *see also Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999) ("[T]he most critical factual material that is used to support the agency's position on review must have been made public *in the proceeding* and exposed to refutation.") (citation omitted). As discussed above, EPA's proposal provided no explanation or factual support to connect numerous of the provisions to its claimed need for additional oversight to prevent double counting

51

and fraud.[23] Had EPA provided some semblance of an explanation with the proposal, rather than in response to comments, the industry could have more directly addressed its late asserted concerns.

### B. It is Not Sufficient for EPA to Merely Provide Proposed Regulatory Language to Meet its Procedural Obligations.

It is without question that EPA has an obligation to do more than simply provide proposed regulatory language to meet its notice requirements. "These requirements, which serve important purposes of agency accountability and reasoned decisionmaking, impose a significant duty on the agency." *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1132-33 (D.C. Cir. 1995) (citations omitted). The need to provide an explanation for the agency's position is arguably heightened when EPA is amending a regulation and, by definition, changing a prior (and relied on) position. "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books. … And of course the agency must show that there are good reasons for the new policy." *Fox TV Stations, Inc.*, 556 U.S. at 515 (citation omitted). It is impossible for the public to be able to comment on a change in policy when the agency fails to explain its asserted "good reasons" for it.

---

[23] Any claims that the provisions "streamline" the regulatory burdens on industry is simply incorrect.

The importance of following proper notice and comment procedures cannot be overstated. "If the notice of proposed rule-making fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully upon the agency's proposals. As a result, the agency may operate with a one-sided or mistaken picture of the issues at stake in a rule-making." *Conn. Light & Power Co. v. Nuclear Regulatory Com.*, 673 F.2d 525, 530 (D.C. Cir. 1982). For example, EPA added the term "leakage" as grounds to require RIN retirement under 40 C.F.R. §80.1434(a)(5) in the proposal without explanation. 87 Fed. Reg. at 80,747 (JA292). The change was not even listed in its table listing the "numerous technical amendments to the RFS and fuel quality regulations ... being made to correct minor inaccuracies and clarify the current regulations." *Id.* at 80,708 (JA253). Despite EPA's failure to meet its procedural obligations, EPA finalized this change over the public's objections.

Although EPA does not dispute that "leakage" was not previously included in the regulations and cites to no prior discussion referring to "leakage" as grounds to retire RINs, EPA simply states that it "disagree[s] with the implication that retiring RINs for leakage of renewable fuel was not previously required." EPA-HQ-OAR-2021-0427-1114 at 230 (JA545). Referring to retirement of RINs for spills of liquid fuels, EPA further stated that it only added the term "leakage" under 40 C.F.R. §80.1434(a)(5) "to clarify the terminology as it pertains to RNG for use when

53

retiring RINs in the EMTS system. *Id.* at 230-231 (JA545-546). But, this provides no clarification at all.

Spills of liquid biofuels is a very different situation, as they can be seen and can be quantified. "Leakage," on the other hand, can mean different things depending on the circumstances, particularly when one is talking about gas that is invisible and gas going through a commercial pipeline. Moreover, methane volumes are measured at injection and the withdrawal points to confirm RIN generation and separation. What RINs would need to be retired in the event of "leakage"? Merely inserting the term in the regulations provides regulated entities with no notice whatsoever as to their obligations under the regulations.

### C.    EPA Failed to Provide Notice or an Adequate Explanation for Several Provisions in the Final Rule.

EPA failed to comply with the procedural requirements of the Clean Air Act with respect to several provisions of the Biogas Reforms.[24] Notice of agency action is "crucial." *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 100 (D.C. Cir. 2013) (quoting *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 95 (D.C. Cir. 2010)) (internal quotation omitted); *see also Envtl.*

---

[24] Petitioner did object to EPA's failure to follow the Clean Air Act's notice and comment requirements with respect to the Biogas Reforms. EPA-HQ-OAR-2021-0427-0756 at 50 (JA432).

*Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005); 42 U.S.C. §7607(d)(3), (h); 5 U.S.C. §553(b), (c).

EPA changed the definition of "continuous measurement" to require that data be "recorded" at regular intervals. 40 C.F.R. §80.2. While EPA claims this was made in response to comments raising concerns regarding data storage, EPA-HQ-OAR-2021-0427-1114 at 282-283 (JA568-569), requiring that data be "recorded" would seem to exacerbate those concerns in light of the substantial amount of data involved and the recordkeeping and reporting requirements in the rule.

EPA also added "renewable CNG/LNG," without explanation, to the continuous measurement requirement provisions. *Compare* 87 Fed. Reg. at 80,733 (proposed 40 C.F.R. §80.165(a)) (JA278), *with* 88 Fed. Reg. at 44,574 (40 C.F.R. §80.155(a)) (JA107). This indicates that CNG/LNG may need to be continuously measured at retail stations, but it is simply impractical and unnecessary to do so through in-line gas chromatographs and the specified flow meters.

EPA also specified whether the volume of biogas and renewable natural gas be reported in either BTU "higher heating value" or "lower heating value," and specified that ASTM D3588 be used to convert between higher heating value and lower heating value. 40 C.F.R. §80.155(f). This ratio implicates volume measurements for purposes of RIN generation, which, under EPA's new requirements, would reduce the volumes of gas used to calculate the number of RINs

55

that can be generated. This fundamentally changes the economics of each and every facility. EPA made this change without notice or explanation, even though this changes how CNG/LNG RINs have been calculated since 2014.

EPA implicitly admitted that it did not explain these changes in the final rule, referring to these changes as "standard updates" in their response to Petitioner's motion to sever [Doc #2026203 at 11 n.2], but the Clean Air Act provides no such exceptions from the notice-and-comment requirements. 42 U.S.C. §7607(d). Moreover, on their face, these regulations impose *increased* burdens than in the proposal and change the long-standing operations of the industry. The industry should have been afforded an opportunity to explain why these changes are not appropriate.

EPA's failure to provide any explanation for these provisions renders them arbitrary. Such violations of its procedural obligations are not harmless as they change settled expectations with no justification. This Court "typically vacates rules when an agency 'entirely fail[s]' to provide notice and comment." *Daimler Trucks N. Am.*, 737 F.3d at 103 (quoting *Shell Oil Co.*, 950 F.2d at 752); *see also Sierra Club v. EPA*, 699 F.3d 530, 535 (D.C. Cir. 2012) (vacating and remanding determination made without required notice and comment).

56

## V.  IN LIGHT OF THE NUMEROUS QUESTIONS LEFT OPEN BY EPA REGARDING THE BIOGAS REFORM REQUIREMENTS, THE IMPLEMENTATION DEADLINES EPA SET ARE ALSO ARBITRARY.

Since EPA released the proposed Biogas Reforms, Petitioner has urged it to sit down with the industry to discuss EPA's concerns to implement a practical and workable program that continues to incentivize biogas-derived fuels in the transportation fuel market, as Congress envisioned. EPA did agree to extend the initially proposed January 1, 2024 implementation date for the Biogas Reforms, choosing July 1, 2024 as the implementation date for facilities registered after that date (i.e., new facilities) and January 1, 2025 as the implementation date for facilities that already have been registered with EPA. However, in light of the numerous issues and outstanding questions regarding the final rule and the limited guidance from EPA, these implementation dates have been rendered arbitrary. The final rule requires existing facilities to register by October 2024 or stop participating in the program. To ensure a meaningful remedy, this Court must vacate the implementation dates for the Biogas Reforms.

## CONCLUSION AND REQUESTED REMEDY

For the foregoing reasons, the petition for review must be granted and the unlawful provisions be vacated. To minimize confusion, however, Petitioner respectfully requests that this Court vacate the entire Biogas Regulatory Reform Rule, which is severable from other parts of the RFS Set Rule, and instruct EPA to

issue revised regulations consistent with the Court's decision. "'[V]acatur is the normal remedy' when a rule is found unlawful." *Am. Pub. Gas Ass'n v. DOE*, 72 F.4th 1324, 1342 (D.C. Cir. 2023) (citations omitted). Several of the provisions are arguably interdependent with the challenged provisions and, therefore, the industry cannot comply with the regulations in a piecemeal fashion. Moreover, the deficiencies here cannot be corrected on remand, and vacatur would prevent "disruptive consequences." *Id.* (citations omitted).

Respectfully submitted,


        */s/ Sandra P. Franco*
Sandra P. Franco
Franco Environmental Law LLC
600 Pennsylvania Ave., SE
Unit 15577
Washington, DC 20003
(202)256-6115
Sandra@francoenvironmentallaw.com

Jonathan Y. Ellis
McGuireWoods LLP
888 16th Street NW, Suite 500
Washington, DC 20006
Tel: (202) 857-1700
Fax: (202) 857-1737
jellis@mcguirewoods.com

*Counsel for Coalition for Renewable Natural Gas*

Of Counsel:

David Cox
General Counsel
COALITION FOR RENEWABLE NATURAL GAS
1017 L Street, #513
Sacramento, CA 95814

Dated:  March 12, 2024

## CERTIFICATION OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7), the undersigned hereby certifies that the foregoing Initial Opening Brief of Petitioner:

1.    Complies with Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font; and

2.    Complies with the word limit of 13,000 words in Rule 32(a)(7)(B)(i) because it is 12,872 words based on Microsoft Word for Microsoft 365, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

Dated: March 12, 2024                Respectfully submitted,


                                        */s/ Sandra P. Franco*
                                        Sandra P. Franco

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of March, 2024, I caused to be electronically filed the foregoing Final Opening Brief of Petitioner with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the Court's CM/ECF system, which will serve counsel of record.

*/s/ Sandra P. Franco*
Sandra P. Franco