ORAL ARGUMENT SCHEDULED APRIL 25, 2024

No. 23-1248

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

COALITION FOR RENEWABLE NATURAL GAS,
*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent*.

_____

Petition for Review of an Action of the U.S. Environmental Protection
Agency

_____

**FINAL BRIEF FOR RESPONDENT U.S. ENVIRONMENTAL
PROTECTION AGENCY**

_____

Of Counsel:

Nora Greenglass
Lucas May
*Attorneys*
U.S. Environmental Protection
Agency

Todd Kim
*Assistant Attorney General*

KIMERE J. KIMBALL
ALEXANDER M. PURPURO
*U.S. Department of Justice*
*Env't and Nat. Res. Div.*
*Environmental Defense Section*
P.O. Box 7611
Washington, D.C. 20044
(202) 514-2285/9771
Kimere.Kimball@usdoj.gov
Alexander.Purpuro@usdoj.gov

## RESPONDENT'S CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for Respondent, United States Environmental Protection Agency ("EPA" or the "Agency"), submits this certificate as to parties, rulings, and related cases.

### A.    Parties and Amici

Petitioner in this action is the Coalition for Renewable Natural Gas.  Respondent is EPA.

There are no intervenors or amici at this time.

### B.    Rulings Under Review

The agency action under review is (1) EPA's rule entitled "Renewable Fuel Standard Program (RFS): Standards for 2023-2025 and Other Changes," 88 Fed. Reg. 44468 (July 12, 2023) ("Set Rule").

### C.    Related Cases

The 2023-2025 Rule is simultaneously being challenged in seven cases consolidated under lead case *Center for Biological Diversity v. EPA, et al.*, Case No. 23-1177 (D.C. Cir. 2023).  That case has not yet been briefed or set for argument.

/s/ *Kimere J. Kimball*
KIMERE KIMBALL
Counsel for Respondent

# TABLE OF CONTENTS

RESPONDENT'S CERTIFICATE AS TO PARTIES,
RULINGS, AND RELATED CASES .......................................................i

TABLE OF AUTHORITIES ....................................................................v

GLOSSARY ........................................................................................ xiii

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION ......................................................1

STATEMENT OF THE ISSUES ...........................................................1

PERTINENT STATUTES AND REGULATIONS ...............................2

STATEMENT OF THE CASE ..............................................................2

    A.    Statutory and Regulatory Background .......................................2

        1.    The RFS Program .................................................................2

        2.    Renewable Identification Numbers or
              "RINs" ................................................................................4

        3.    Prior Regulatory Structure for Biogas in the
              RFS Program ......................................................................5

    B.    The Biogas Regulatory Reforms ..............................................11

SUMMARY OF ARGUMENT ............................................................16

STANDARD OF REVIEW ..................................................................20

ARGUMENT ........................................................................................22

I.    THE CLEAN AIR ACT AUTHORIZES BIOGAS
    REQUIREMENTS THAT ENSURE RFS PROGRAM
    INTEGRITY. ..............................................................................22

A.  EPA Is Not Restricted to Regulating Only
Obligated Parties. ............................................25

B.  EPA Has Authority to Promulgate the Two
Specific Regulatory Provisions Cited by
Petitioner. ........................................................29

II.  THE CHALLENGED REFORM PROVISIONS ARE
NOT ARBITRARY OR CAPRICIOUS. ..................................34

A.  EPA's Direct Regulation of Biogas Producers
Reasonably Serves EPA's Interest in Preventing
Fraud and Double Counting. ...........................35

B.  EPA's Testing Requirements and Use of Pipeline
Specifications Are Adequately Explained and
Reasonable. ......................................................45

C.  EPA's Continuous Measurement Requirements
Serve to Prevent Fraud and Double Counting. ........................48

D.  EPA's Limitation That Biogas Producers in
Closed Distribution Systems Only Sell Biogas to a
Single Renewable Fuel Producer Is Not Arbitrary
and Petitioner Has Insufficiently Raised Its
Argument. ........................................................55

III.  EPA COMPLIED WITH PROCEDURAL
REQUIREMENTS. ...............................................................57

A.  EPA Provided Adequate Factual Support for the
Reforms Addressing Double Counting and Fraud. ................57

B.  EPA's Specification That "Leakage" Constitutes a
Basis to Retire RINs Associated with Lost Fuel
Volumes Was Identified in the Notice of Proposed
Rulemaking and Adequately Explained. ..................58

C.      Because Petitioner Failed to Raise Its Objections Regarding Changes to the Final Rule, Its Arguments Regarding Those Changes Are Not Reviewable. ..........................................................60

D.      Petitioner Fails to Establish That Any Alleged Procedural Error Warrants the Invalidation of the Reforms. ...................................................65

IV.   EPA'S IMPLEMENTATION DEADLINES PROVIDE ADEQUATE TIME FOR COMPLIANCE............................................66

V.   THE COURT SHOULD DENY PETITIONER'S REQUEST FOR VACATUR..................................................68

CONCLUSION ....................................................................69

CERTIFICATE OF COMPLIANCE .............................................71

# TABLE OF AUTHORITIES

## CASES

*Am. Fuel & Petrochemical Mfrs. v. EPA ("AFPM"),*
  937 F.3d 559 (D.C. Cir. 2019) ........................................................ 20, 69

*Am. Petroleum Inst. v. EPA,*
  706 F.3d 474 (D.C. Cir. 2013) ................................................................ 40

*Ams. for Clean Energy v. EPA,*
  864 F.3d 691 (D.C. Cir. 2017) ................................................................ 40

*Appalachian Power Co. v. EPA,*
  135 F.3d 791 (D.C. Cir. 1998) ................................................................ 63

*Bluewater Network v. EPA,*
  370 F.3d 1 (D.C. Cir. 2004) ..................................................................... 20

*Cement Kiln Recycling Coal. v. EPA,*
  493 F.3d 207 (D.C. Cir. 2007) ................................................................ 60

*City of Waukesha v. EPA,*
  320 F.3d 228 (D.C. Cir. 2003) ........................................................ 56, 67

*Cmty. Nutrition Inst. v. Block,*
  749 F.2d 50 (D.C. Cir. 1984) .................................................................. 64

*CSX Transp., Inc. v. Surface Transp. Bd.,*
  584 F.3d 1076 (D.C. Cir. 2009) ............................................................. 63

*Ctr. for Auto Safety v. Fed. Highway Admin.,*
  956 F.2d 309 (D.C. Cir. 1992) ................................................................ 36

*Daimler Trucks N. Am., LLC v. EPA,*
  737 F.3d 95 (D.C. Cir. 2013) .................................................................. 66

*Fertilizer Inst. v. EPA,*
  935 F.2d 1303 (D.C. Cir. 1991) ............................................................. 63

*Fla. Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) ................................................................................ 20

*Genus Med. Techs. LLC v. FDA,*
    994 F.3d 631 (D.C. Cir. 2021) ............................................... 26

*Growth Energy v. EPA,*
    5 F.4th 1 (D.C. Cir. 2021) ..................................................... 69

*Guedes v. ATF,*
    45 F.4th 306 (D.C. Cir. 2022) ..................................... 21, 29

*Heating, Air Conditioning & Refrigeration Distributors, Int'l v. EPA,*
    71 F.4th 59 (D.C. Cir. 2023) ................................................. 22

*Jimenez v. Quarterman,*
    555 U.S. 113 (2009) ................................................................ 25

*Lead Indus. Ass'n, Inc. v. EPA,*
    647 F.2d 1130 (D.C. Cir. 1980) ........................................... 20

*Life Techs. Corp. v. Promega Corp.,*
    580 U.S. 140 (2017) ................................................................ 26

*Mexichem Specialty Resins, Inc. v. EPA,*
    787 F.3d 544 (D.C. Cir. 2015) ............................................. 36

*Miss. Comm'n on Env't Quality v. EPA,*
    790 F.3d 138 (D.C. Cir. 2015) ....................................... 20, 51

*Mossville Env't Action Now v. EPA,*
    370 F.3d 1232 (D.C. Cir. 2004) ........................................... 30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................. 20

*Ne. Md. Waste Disposal Auth. v. EPA,*
    358 F.3d 936 (D.C. Cir. 2004) ....................................... 21, 63

*New York v. EPA,*
    413 F.3d 3 (D.C. Cir. 2005) .................................................. 55

*Pers. Watercraft Indus. Ass'n v. Dept. of Com.,*
    48 F.3d 540 (D.C. Cir. 1995) ............................................... 63

*Produce Place v. U.S. Dep't of Agric.,*
    91 F.3d 173 (D.C. Cir. 1996) ................................................................ 32

*Sierra Club v. EPA,*
    699 F.3d 530 (D.C. Cir. 2012) .............................................................. 66

*Stilwell v. Off. of Thrift Supervision,*
    569 F.3d 514 (D.C. Cir. 2009) ....................................................... 35, 38

*United States v. McGill,*
    815 F.3d 846 (D.C. Cir. 2016) ....................................................... 55, 58

*Util. Air Regul. Grp. v. EPA,*
    744 F.3d 741 (D.C. Cir. 2014) ....................................................... 21, 64

*Wash. All. of Tech. Workers v. DHS,*
    50 F.4th 164 (D.C. Cir. 2022) ....................................................... 21, 29

*Watt v. W. Nuclear, Inc.,*
    462 U.S. 36 (1983) ............................................................................... 28

*West Virginia v. EPA,*
    362 F.3d 861 (D.C. Cir. 2004) .............................................................. 66

*Wis. Cent. Ltd. v. United States,*
    138 S. Ct. 2067 (2018) .......................................................................... 27

*Wisconsin v. EPA,*
    938 F.3d 303 (D.C. Cir. 2019) ....................................................... 61, 65

*Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.,*
    550 U.S. 81 (2007) ............................................................................... 28

**STATUTES**

42 U.S.C. § 7545(c) ................................................................................ 46

42 U.S.C. § 7545(*o*) ........................................................................... 1, 2

42 U.S.C. § 7545(*o*)(1)(B)(ii) ............................................................. 27

42 U.S.C. § 7545(*o*)(1)(B)(ii)(IV) ...................................................... 17

42 U.S.C. § 7545(*o*)(1)(B)(ii)(V) ........................................... 6, 22, 23

42 U.S.C. § 7545(*o*)(1)(E) ........................................................... 27

42 U.S.C. § 7545(*o*)(1)(I)-(J) ........................................... 17, 22, 23

42 U.S.C. § 7545(*o*)(1)(I) ............................................. 3, 6, 23, 27

42 U.S.C. § 7545(*o*)(1)(I)(i) ..................................................... 42

42 U.S.C. § 7545(*o*)(1)(J)................................................. 3, 23, 27

42 U.S.C. § 7545(*o*)(2) ................................................................ 3

42 U.S.C. § 7545(*o*)(2)(A)(i) ... 4, 5, 9, 16, 17, 22, 23, 24, 25, 26, 27, 29, 31, 32

42 U.S.C. § 7545(*o*)(2)(A)(iii) ................................... 4, 17, 25, 26

42 U.S.C. § 7545(*o*)(2)(A)(iii)(I) ............................................. 26

42 U.S.C. § 7545(*o*)(2)(B) .......................................................... 4

42 U.S.C. § 7545(*o*)(2)(B)(ii) ............................................ 3, 4, 40

42 U.S.C. § 7545(*o*)(2)(B)(iv) .................................................. 40

42 U.S.C. § 7545(*o*)(3) ............................................................. 27

42 U.S.C. § 7545(*o*)(3)(B)(i) ...................................................... 4

42 U.S.C. § 7545(*o*)(5) ........................................................... 4, 5

42 U.S.C. § 7545(*o*)(7)(A) .......................................................... 4

42 U.S.C. § 7545(*o*)(7)(D)-(F) .................................................... 4

42 U.S.C. § 7607(b)(1)................................................................. 1

42 U.S.C. § 7607(d)(1)(E)........................................................... 20

42 U.S.C. § 7607(d)(7)(A)........................................................... 20

42 U.S.C. § 7607(d)(7)(B).............................. 17, 19, 30, 49, 50, 55, 61, 62

42 U.S.C. § 7607(d)(8)......................................................19, 65

42 U.S.C. § 7607(d)(9)(A) ........................................................20

42 U.S.C. § 7607(d)(9)(D) ........................................................21

42 U.S.C. § 7607(d)(9)(D)(iii)...................................................65

42 U.S.C. § 7675(e)(2)(B).........................................................23

Pub. L. No. 109-58, 119 Stat. 594 (2005).....................................2

Pub. L. No. 110-140, 121 Stat. 1492 (2007)....................2, 27, 40

## CODE OF FEDERAL REGULATIONS

15 C.F.R. § 287.4......................................................................51

15 C.F.R. § 287.4(f)..................................................................52

40 C.F.R. § 80.2.............................6, 8, 11, 45, 48, 60, 62, 68

40 C.F.R. § 80.105(a)(1) ...........................................................68

40 C.F.R. § 80.105(b) ...............................................................13

40 C.F.R. § 80.105(k)(1).............................................15, 29, 32

40 C.F.R. § 80.105(k)(2).............................................15, 55, 56

40 C.F.R. § 80.110(b) ...............................................................13

40 C.F.R. § 80.110(f)(2)(iii) ..............................................15, 45

40 C.F.R. § 80.115....................................................................68

40 C.F.R. § 80.125(a)(2) ...........................................................68

40 C.F.R. § 80.125(b)(1) .....................................................13, 68

40 C.F.R. § 80.125(d)(1) ...........................................................68

40 C.F.R. § 80.125(d)(1)(i)-(iii) ................................................13

40 C.F.R. § 80.125(d)(2) ................................................................ 68

40 C.F.R. § 80.135(b)(1) ................................................................ 15

40 C.F.R. § 80.135(b)(2) ................................................................ 15

40 C.F.R. § 80.135(d)(3) ................................................................ 47

40 C.F.R. § 80.135(d)(6) ................................................................ 47

40 C.F.R. § 80.140(b) ...................................................... 13, 14, 16

40 C.F.R. § 80.140(c) ............................................................ 14, 16

40 C.F.R. § 80.145(c)(5) ................................................................ 45

40 C.F.R. § 80.145(c)(6) ................................................................ 45

40 C.F.R. § 80.145(c)(11) ....................................................... 45, 47

40 C.F.R. § 80.155 ......................................................................... 51

40 C.F.R. § 80.155(a) .................................................................... 61

40 C.F.R. § 80.155(a)(2) ............................................................... 16

40 C.F.R. § 80.155(a)(3)(ii) .................................................... 16, 54

40 C.F.R. § 80.155(f) .................................................................... 61

40 C.F.R. § 80.165(c)(4)(iii) .......................................................... 45

40 C.F.R. § 80.170 ......................................................................... 44

40 C.F.R. § 80.185(c)(1)(i)(D) ........................................ 29, 30, 31

40 C.F.R. § 80.1425(g)(1) ............................................................... 6

40 C.F.R. § 80.1426 ......................................................................... 6

40 C.F.R. § 80.1426, Table 1 ........................................................ 24

40 C.F.R. § 80.1426(a) ............................................................. 4, 5

40 C.F.R. § 80.1426(e)................................................................ 4, 5

40 C.F.R. § 80.1426(f)(10), (11), (12) (July 1, 2010) ................................ 28

40 C.F.R. § 80.1426(f)(10), (11), (12) (Sep. 16, 2014)............................. 28

40 C.F.R. § 80.1426(f)(10)(ii) (2022) ............................................. 9

40 C.F.R. § 80.1426(f)(10), (11) (2022) ........................................ 7

40 C.F.R. § 80.1426(f)(11) (2022) ........................................... 7, 10

40 C.F.R. § 80.1426(f)(11)(ii) (2022) ......................................... 9, 10

40 C.F.R. § 80.1427(a)(1) ...................................................... 5

40 C.F.R. § 80.1428(b) ......................................................... 5

40 C.F.R. § 80.1429(b) ......................................................... 5

40 C.F.R. § 80.1429(b)(1) ...................................................... 5

40 C.F.R. § 80.1429(b)(5) (2022) ............................................. 10

40 C.F.R. § 80.1431(a)(1)(vi)(2023) ......................................... 59

40 C.F.R. § 80.1434 (2023) .................................................. 59

40 C.F.R. § 80.1434(a)(5) (2020) ........................................... 59

40 C.F.R. § 80.1450(b) (2022) ............................................... 9

40 C.F.R. § 80.1451(b) (Aug. 30, 2022) .................................... 9

40 C.F.R. § 80.1461 ......................................................... 44

40 C.F.R. § 80.1476(g)(1) .................................................. 56

## FEDERAL REGISTER

72 Fed. Reg. 23900 (May 1, 2007) ..........................................................28

75 Fed. Reg. 14670 (Mar. 26, 2010) .......................................................28

79 Fed. Reg. 42128 (July 18, 2014) ....................................................6, 28

87 Fed. Reg. 39600 (July 1, 2022) ........................................11, 12, 56, 57

88 Fed. Reg. 44468 (July 12, 2023) ..........................................................i

# GLOSSARY

| | |
|---|---|
| Btu | British thermal unit |
| CAA | Clean Air Act |
| EPA | Environmental Protection Agency |
| MMBtu | Million Btu |
| RFS | Renewable Fuel Standard |
| RIN | Renewable Identification Number |
| RNG | Renewable Natural Gas |

## INTRODUCTION

The Renewable Fuel Standard ("RFS") program of the Clean Air Act ("CAA") requires that transportation fuel sold in the United States contain specified amounts of certain renewable fuels.  42 U.S.C. § 7545(*o*).  In the action under review, the Environmental Protection Agency ("EPA") revised portions of the RFS program governing the production of renewable fuel from biogas, which is a type of gas produced from the decomposition of organic wastes.

The challenged revisions fall within EPA's authority and reasonably strengthened the program by eliminating the potential for double counting of compliance credits and other opportunities for fraud. Because Petitioner's assorted substantive and procedural attacks on the rule all lack merit, the petition for review should be denied.

## STATEMENT OF JURISDICTION

The Court has jurisdiction to consider the petition under the CAA. 42 U.S.C. § 7607(b)(1).

## STATEMENT OF THE ISSUES

1) Does EPA's statutory mandate to "ensure" through regulation that transportation fuel contains the requisite volume of renewable fuel

authorize EPA to promulgate requirements that ensure biogas used to produce renewable fuel in the RFS program meets the statutory requirements of that program?

2) Did EPA reasonably revise biogas requirements to avoid the potential for double counting of compliance credits and to minimize opportunities for fraud?

3) Did EPA provide adequate notice of the revisions in its Notice of Proposed Rulemaking?

4) Did EPA reasonably establish a compliance deadline at the date Petitioner specifically requested?

## PERTINENT STATUTES AND REGULATIONS

EPA has provided materials in the attached addendum to supplement materials contained in Petitioner's addendum.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

### 1.    The RFS Program

In 2005 and again in 2007, Congress amended the CAA to establish the RFS program, codified at 42 U.S.C. § 7545(*o*).  *See* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594; Energy

Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492.

The statute required increasing annual "applicable volumes" of renewable fuel to be introduced into the United States' transportation fuel supply each year through 2022.  42 U.S.C. § 7545(*o*)(2).  After 2022, the CAA directs EPA to determine the applicable volumes of renewable fuel.  42 U.S.C. § 7545(*o*)(2)(B)(ii).

The statute addresses four nested categories of renewable fuel: biomass-based diesel, cellulosic biofuel, advanced biofuel, and total renewable fuel.  Renewable fuel that is used to satisfy the volume requirements must be produced from "renewable biomass" and be "used to replace or reduce the quantity of fossil fuel present in a transportation fuel."  42 U.S.C. § 7545(*o*)(1)(J).  Not all biofuels qualify as "renewable fuel."  Critically, the CAA enumerates seven categories of feedstocks that qualify as "renewable biomass"; renewable fuel must be produced from one or more of these feedstocks to qualify.  *Id.* § 7545 (*o*)(1)(I).

Congress also directed EPA to establish a compliance program and annual percentage standards to ensure that the applicable volumes

are sold each year. *Id.* § 7545(*o*)(2)(A)(i), (iii), (2)(B), (3)(B)(i), (7)(A), (7)(D)-(F). EPA determines and publishes the "applicable volume requirements" and the "renewable fuel obligation" for each compliance year. 42 U.S.C. § 7545(*o*)(2)(B)(ii). Obligated parties—refiners and importers of gasoline and diesel fuel—apply the percentage standards to their annual production or importation of gasoline or diesel, to calculate their individual renewable volume obligation for each renewable fuel.

### 2.    Renewable Identification Numbers or "RINs"

To implement Congress's requirement for a credit-trading program, 42 U.S.C. § 7545(*o*)(5), EPA established a system of compliance credits referred to as Renewable Identification Numbers ("RINs").

Obligated refiners and importers are not themselves required to blend renewable fuel into the gasoline and diesel they sell to comply with their individual requirements. Instead, producers and importers of renewable fuel generate RINs for the renewable fuel they produce or import into the United States, with different types of renewable fuel generating different types of RINs. 40 C.F.R. § 80.1426(a), (e). RINs

that are "attached" to batches of renewable fuel can be "separated" under certain conditions and then traded between registered parties. 40 C.F.R. §§ 80.1428(b), 80.1429(b); *see also* 42 U.S.C. § 7545(*o*)(5).

An obligated party can obtain RINs either by purchasing renewable fuel with RINs attached or by purchasing separated RINs from others.  40 C.F.R. §§ 80.1426(a), (e), 80.1428(b), 80.1429(b)(1). Each obligated party then demonstrates compliance with its individual obligations by "retir[ing]" a sufficient number of RINs in an annual compliance demonstration.  *Id.* § 80.1427(a)(1).

### 3.    Prior Regulatory Structure for Biogas in the RFS Program

To "ensure that transportation fuel sold or introduced into commerce in the United States . . . contains at least the applicable volume of renewable fuel . . . ," EPA regulations include rules intended to verify that renewable fuel credited in the RFS program is, as required, both: (1) produced from a qualifying renewable biomass feedstock; and (2) ultimately used for transportation.  *Id.* § 7545(*o*)(2)(A)(i).

One subset of renewable fuel identified as advanced biofuel is "biogas" that is "produced through the conversion of organic matter

from renewable biomass." *Id*. § 7545(*o*)(1)(B)(ii)(V).  Biogas itself is not considered renewable biomass but, rather, is produced from the breakdown of renewable biomass such as separated yard or food waste or animal waste material in a digester or landfill.  *Id*. § 7545(*o*)(1)(I); JA55.  Biogas produced through this process is a combination of methane and inert gases along with other impurities.  The party who produces biogas through this process is the "biogas producer" under EPA's regulations.  40 C.F.R. § 80.2.  Biogas, as described by EPA's regulations, cannot be used as transportation fuel in its unrefined form because of contaminants, *id*. ("*Biogas* . . . requires removal of additional components to be suitable for its designated use"), and must first be "upgraded" to remove those contaminants.

In 2014, EPA finalized a rule that provided for the generation of cellulosic biofuel (D3)[1] RINs for biogas-derived renewable compressed or liquified natural gas.  *See* 79 Fed. Reg. 42128 (July 18, 2014).  D3 RIN generation was based on the production of biogas from landfills and

---

[1] The D-Code for a RIN is an identifier that corresponds to the type of renewable fuel that is used to generate a RIN.  *See* 40 C.F.R. § 80.1426. A D-Code 3 RIN denotes fuel categorized as cellulosic biofuel.  *Id*. § 80.1425(g)(1).

anaerobic digesters using qualifying cellulosic feedstocks, including municipal wastewater, certain agricultural wastes, separated yard waste, and the cellulosic components of biomass processed by other waste digesters.

The prior regulatory structure contemplated two avenues through which biogas from a landfill or anaerobic digestor could be converted to use as transportation fuel.  40 C.F.R. § 80.1426(f)(10), (11) (2022).  The first is where biogas is injected into a closed distribution system.  In this case, there is a direct physical connection between the locations where the biogas is produced, where the biogas is treated to remove impurities, and where the biogas is compressed or liquified for use as transportation fuel.  Any party in a closed distribution system can generate RINs for transportation fuel produced from this biogas.[2]

The second avenue involves Renewable Natural Gas ("RNG") injected into a commercial distribution system.  This system is more complicated than a closed distribution system because there is no direct connection between biogas production and the compressed or liquified

--------

[2] EPA has largely left its regulations governing this closed distribution system biogas unchanged. JA60.

natural gas that is ultimately used as transportation fuel.  Under this avenue, biogas is treated and upgraded to RNG before it is injected into a commercial pipeline system.  The party who upgrades the biogas into RNG is defined as the "RNG producer."  *See id.* § 80.2.



Figure 1: Biogas/RNG Production Chain.[3]

---

[3] Graphic available at https://www.epa.gov/sites/default/files/2017-09/collecting_processing_methane.png.  RNG can be used for many purposes, including as transportation fuel when it is withdrawn and converted to compressed natural gas or liquified natural gas.

When injected, the RNG is intermingled with non-renewable (i.e., fossil) natural gas and other RNG. A downstream party then withdraws a volume of natural gas from the commercial pipeline that corresponds to the injected volume of RNG and converts it to renewable compressed or liquified natural gas. Each of the steps, from biogas production to RNG compression or liquification, can involve a separate entity.

Under the prior regulatory framework, parties that sought to generate RINs based on a volume of renewable compressed or liquified natural gas were required to demonstrate that such volume was produced from qualifying renewable biomass and that it was actually sold and used as transportation fuel. *See* 40 C.F.R. § 80.1426(f)(10)(ii), (11)(ii) (2022); *see also* 42 U.S.C. § 7545(*o*)(2)(A)(i), JA314. The RIN generator could do this by providing EPA with feedstock information, an engineering review, process flow diagrams, dispensing locations, contracts between parties involved in the production process, and gas analysis samples. *See* 40 C.F.R. §§ 80.1450(b) (2022), 80.1451(b) (Aug. 30, 2022).

Under this framework, EPA oversaw the generation of RINs by tracking the contractual relationships that existed between parties in the above-described "RNG chain," from biogas production through transportation use. *See* 40 C.F.R. § 80.1426(f)(11)(ii) (2022). Any party who could provide EPA with documentation corroborating the existence of a contractual chain between biogas that was produced from qualifying renewable biomass and for which a corresponding volume was eventually used as transportation fuel, could conceivably generate RINs under that framework. *Id.* §§ 80.1426(f)(11), 80.1429(b)(5) (2022).

EPA received RFS registration requests from a variety of parties, including vehicle fleet operators who used renewable compressed or liquified natural gas, dispensers of renewable compressed or liquified natural gas, RNG producers, biogas producers, and even third-party marketers whose only involvement in the process was organizing the contracts between RNG producers and compressed or liquified natural gas users. *See* JA57-58.

Although the prior regulations prohibited "double counting" volumes of renewable fuel for RIN generation, the lack of a specified RIN generator, combined with the difficulty of tracking contractual

relationships associated with complicated production chains created an undue risk of multiple entities potentially claiming RINs based on the same volume of biogas.  JA58.  EPA had to endeavor to discern from a complex series of contracts and documents whether each volume of biogas corresponding to renewable fuel was produced from qualifying feedstocks and that no other party also claimed credit for that volume. This process imposed a substantial administrative burden on EPA and made it increasingly difficult for EPA to confirm that parties were generating valid RINs and were not double counting volumes of biogas. *See* JA59; JA189.

## B.    The Biogas Regulatory Reforms

In a 2022 rulemaking allowing the use of biointermediates in the RFS program, EPA expressed its intent to expand the biogas program to allow for new avenues to generate RINs from renewable fuel.[4]  87 Fed. Reg. 39600, 39640-41 (July 1, 2022).  In that same rulemaking, EPA indicated that given the anticipated increase in complexity from

---

[4] A biointermediate is, generally, a renewable biomass feedstock that is substantially pre-processed at one facility before being sent to a different facility to produce renewable fuel for which RINs are generated.  40 C.F.R. § 80.2.

an expansion of the program, particularly in circumstances where biogas is upgraded to RNG and distributed via a commercial pipeline, a new regulatory structure was necessary to ensure better tracking of biogas. *Id.* at 39641.

In July 2023, EPA then promulgated, as part of a larger rulemaking, the necessary reforms to the biogas rules, and this is the rule now under review (hereinafter, the "Reforms"). In a part of the rule not challenged here, the Reforms newly allowed parties to generate RINs not only for biogas-derived compressed or liquified natural gas, but also for *other* types of renewable fuels produced from biogas-derived biointermediates or from RNG. Allowing the use of biogas as a biointermediate and RNG as a feedstock also entailed allowing renewable fuel production from biogas and RNG to span two different facilities for the first time.

In the portion of the Reforms that is most relevant here, EPA revised its oversight mechanisms for biogas to better ensure program integrity. Among these changes, EPA revised its regulations to specify that the RNG producer is the only party eligible to generate RINs for RNG that is injected into a commercial pipeline. 40 C.F.R.

§ 80.125(b)(1).  Further, only the party who can demonstrate that a particular volume of RNG was used as transportation fuel will be eligible to separate the RINs generated for the RNG.  This can be "[t]he party that withdrew the RNG from the natural gas commercial pipeline system," "[t]he party that produced or oversaw the production of the renewable [compressed or liquified natural gas] from the RNG," or "[t]he party that used or dispensed for use the renewable [compressed or liquified natural gas] as transportation fuel."  *Id.* § 80.125(d)(1)(i)-(iii).

The Reforms additionally newly require that biogas and RNG producers register with EPA before they can participate in the RFS program.  *See, e.g.*, *id.* §§ 80.105(b) (biogas producers), 80.110(b) (RNG producers).  EPA requires registered parties to submit information regarding the volumes of biogas and RNG handled at their facilities.  Biogas producers must submit monthly batch reports to EPA that specify the amount of biogas that a facility produced.  *Id.* § 80.140(b).  For each batch of biogas, biogas producers must also provide information regarding the feedstock used to produce the biogas, the D-code of any RINs that could be generated for renewable fuel produced

13

from that biogas, and the designated use for a batch of biogas (e.g., biointermediate, renewable compressed or liquified natural gas, or RNG), along with the information regarding the party who receives the batch of biogas. *Id.* RNG producers must submit reports verifying the amount of RNG produced from biogas and the amount of RNG injected into the natural gas commercial pipeline system. *Id.* § 80.140(c).

All of these revisions—designating a RIN generator, requiring parties to directly register with EPA, and tracking volumes—significantly improve EPA's ability to verify that renewable fuel is properly credited and thereby promote the overall integrity of the program.

To further minimize program complexity and help avoid the double counting of biogas, EPA further revised its regulations to specify that:

> For each biogas production facility, the biogas producer must only supply biogas for only one of the following uses [under the RFS program]:
>
> > (i) Production of renewable [compressed or liquified natural gas] via a biogas closed distribution system.
> >
> > (ii) As a biointermediate via a biogas closed distribution system.

(iii) Production of RNG.

*Id.* § 80.105(k)(1).  Also, for closed distribution systems, the regulations require that "each biogas production facility producing biogas for use as a biointermediate . . . must only supply biogas or treated biogas to a single renewable fuel production facility."  *Id.* § 80.105(k)(2).

Existing registrants under the RFS program will be subject to the new requirements under the Reforms beginning January 1, 2025, and must submit updated registration materials by October 1, 2024.  JA63; 40 C.F.R. § 80.135(b)(2).  Starting July 1, 2024, parties who wish to participate in the RFS program for the first time must comply with the new requirements.  40 C.F.R. § 80.135(b)(1).

The Reforms also include updated testing and measurement provisions as part of EPA's effort to eliminate opportunities for fraud and double counting of biogas and RNG volumes.  JA67.  RNG producers that "inject[] RNG from an RNG production facility into a natural gas commercial pipeline system" must annually test a representative sample of "[b]iogas used to produce RNG," "RNG before blending with non-renewable components," and "RNG after blending with non-renewable components."  40 C.F.R. § 80.110(f)(2)(iii).  In

supplying this information to EPA, biogas producers and RNG producers are required to measure biogas and RNG pursuant to specified measurement protocols.  *Id.* § 80.140(b), (c).  "Any party required to measure the volume of biogas, RNG, or renewable [compressed or liquified natural gas]" must use in-line gas chromatograph meters and flow meters that comply with specified industry standards.  *Id.* § 80.155(a)(2).  Parties who are unable to use the specified equipment may receive approval to use an alternative measurement protocol, provided they can demonstrate that the alternative is "at least as accurate and precise as the methods specified" in the Reforms.  *Id.* § 80.155(a)(3)(ii).

## SUMMARY OF ARGUMENT

1. EPA's reasonable revisions to its rules addressing the use of biogas within the RFS program falls within its statutory authority.  The CAA broadly authorizes EPA to promulgate regulations to "ensure that transportation fuel sold or introduced into commerce in the United States . . . on an annual average basis, contains at least the applicable volume of renewable fuel" set in the annual volume requirements.  42 U.S.C. § 7545(*o*)(2)(A)(i).  The Act further specifies that, to qualify for

the RFS program, biogas-derived renewable fuel must *both* be used as transportation fuel *and* be made from biogas "produced through the conversion of organic matter" from one of only seven specific feedstocks. *Id.* § 7545(*o*)(1)(B)(ii)(IV), (I)-(J). The statute thus necessarily authorizes EPA to ensure appropriate accounting of renewable fuel produced from biogas that is part of the RFS program from the fuel's original feedstock to its use in transportation fuel.

Although Petitioner argues that a *different* provision at subsection 7545(*o*)(2)(A)(***iii***) does not authorize the Reforms, EPA did not rely on that provision in promulgating the challenged Rule. That separate provision relates specifically to compliance obligations that are imposed on petroleum refiners, blenders, distributors, and importers, but does not curtail EPA's broader statutory authority under Section 7545(*o*)(2)(A)(***i***) to promulgate regulations applicable to other entities.

Moreover, Petitioner has forfeited certain arguments alleging that EPA addressed conduct outside the RFS program by not presenting those arguments in comments before the agency. 42 U.S.C. § 7607(d)(7)(B). Regardless, all of Petitioner's arguments lack merit, as the provisions in question appropriately implement the RFS program.

2. EPA reasonably revised its regulations to directly oversee biogas producers who choose to participate in the RFS program.  Biogas producers uniquely possess information critical to the determination of whether renewable fuel is derived from qualifying renewable biomass. The requirement that they register with EPA and directly provide information to EPA regarding the production of biofuel is crucial to ensuring that RINs generated within the RFS program are valid.

Further, revisions specifying testing and measurement methods ensure that renewable fuel generating RINs under the RFS program is actually renewable.  EPA reasonably established testing requirements and the requirement for pipeline specification information to verify that RNG claimed under the RFS program meets the regulatory definition for RNG and, thus, qualifies as renewable fuel.  And the continuous measurement requirements reasonably enable EPA to track the production of biogas and RNG to ensure that the volumes of renewable fuel claimed for RIN generation are actually produced from renewable sources.

3. EPA provided adequate factual support in its proposal for the Reforms and Petitioner's generalized assertion that "numerous" aspects

18

of the Reforms are not supported is conclusory and therefore forfeited.

Further, Petitioner's argument regarding EPA's specification that fuel

"leakage" as a basis for retiring RINs fails because EPA provided

adequate notice and explanation for that specification.

Petitioner also failed to raise multiple procedural arguments in its

comments on the proposal and those arguments are therefore not

properly before this Court.  *See* 42 U.S.C. § 7607(d)(7)(B).  Additionally,

Petitioner failed to establish a "substantial likelihood" that different

procedures would have "significantly changed" the Rule, and therefore,

the alleged procedural errors do not constitute a basis for invalidating

the Reforms.  *Id.* § 7607(d)(8).

4. The compliance deadline for the Reforms is reasonable.  At the

outset, Petitioner's very generalized assertions regarding the deadline

are too cursory to sufficiently preserve any judicial challenge.

Regardless, EPA appropriately selected the January 1, 2025, deadline

for existing facilities that a number of commenters, *including Petitioner*,

specifically requested.  And, although Petitioner claims the July 1,

2024, deadline for *new* registrants is too early, the rulemaking does not

require any entity to register by that date.

## STANDARD OF REVIEW

The Court may reverse EPA's action if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(1)(E), (d)(9)(A); *see Am. Fuel & Petrochemical Mfrs. v. EPA ("AFPM")*, 937 F.3d 599, 574 (D.C. Cir. 2019).

This standard is narrow, and the Court cannot substitute its policy judgment for EPA's. *Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004). Where EPA has considered the relevant factors and articulated a rational connection between the facts found and the choices made, its decisions must be upheld. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Lead Indus. Ass'n, Inc. v. EPA*, 647 F.2d 1130, 1160 (D.C. Cir. 1980). This Court gives "an 'extreme degree of deference' to EPA's evaluation of 'scientific data within its technical expertise,'" especially "EPA's administration of the complicated provisions of the Clean Air Act." *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 150 (D.C. Cir. 2015) (quotations omitted). The Court's review is limited to the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); 42 U.S.C. § 7607(d)(7)(A).

Courts review an agency's interpretation of a statute it administers for reasonableness. When "traditional tools of statutory interpretation" show that the agency's interpretation is "the best one," the court can uphold the interpretation without resorting to deference principles. *Guedes v. ATF*, 45 F.4th 306, 313 (D.C. Cir. 2022). But agency interpretations that are "reasonable" should also be upheld. *Wash. All. of Tech. Workers v. DHS*, 50 F.4th 164, 192 (D.C. Cir. 2022).

The CAA limits courts' scope of review with respect to claims of procedural errors. 42 U.S.C. § 7607(d)(9)(D); *see also Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 947 (D.C. Cir. 2004). A court may only vacate a rule based on an alleged procedural error if the error was arbitrary and capricious, if the objection was raised during the rulemaking process, and "if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made." *Util. Air Regul. Grp. v. EPA*, 744 F.3d 741, 747-48 (D.C. Cir. 2014) (quoting 42 U.S.C. § 7607(d)(8)); 42 U.S.C. § 7607 (d)(9)(D).

21

## ARGUMENT

## I.   THE CLEAN AIR ACT AUTHORIZES BIOGAS REQUIREMENTS THAT ENSURE RFS PROGRAM INTEGRITY.

As fully explained in EPA's final rule, JA55-56, the CAA authorizes the Reforms.  The statute directs EPA to "ensure that transportation fuel sold or introduced into commerce in the United States . . . contains at least the applicable volume of renewable fuel," and further defines "renewable fuel" to include *only* fuel produced from specifically identified feedstocks.  42 U.S.C. § 7545(*o*)(1)(B)(ii)(V), (1)(I)-(J), (2)(A)(i).  Because the statute explicitly requires EPA to ensure that qualifying renewable fuel is both produced from specific feedstocks at the start of the fuel-production chain and ultimately used as transportation fuel at the end of the chain, the statute necessarily authorizes EPA to impose appropriate requirements throughout the chain of production to ensure the statutory requirements are fulfilled.[5]

_____

[5] EPA's statutory mandate to "ensure that transportation fuel . . . contains at least the applicable volume of renewable fuel" is unlike the language at issue in *Heating, Air Conditioning & Refrigeration Distributors, Int'l v. EPA*, 71 F.4th 59, 66-68 (D.C. Cir. 2023).  There, EPA relied on its statutory mandate to "ensure," via a specific formula, the phasedown of hydrofluorocarbons to a particular percentage of baseline consumption and production, to impose exceedingly tangential

The statutory requirements for eligible renewable fuel are clear and prescriptive.  EPA can *only* accept into the RFS program renewable fuel that is (1) "produced from renewable biomass" and (2) used to "replace or reduce fossil fuel used in transportation fuel."  42 U.S.C. § 7545(*o*)(1)(J); JA55.  With respect to the first, front-end requirement, the statute defines "renewable biomass" as biomass from seven categories of feedstocks (*e.g.*, "separated yard waste or food waste").  42 U.S.C. § 7545(*o*)(1)(I).  "Biogas" is not itself a type of eligible "renewable biomass," but rather must be produced from qualifying renewable biomass in order for fuel produced from that biogas to qualify for the RFS program.  *Id.* § 7545(*o*)(1)(B)(ii)(V), (1)(I).  Importantly, biogas can also be produced from any number of types of biomass that do *not* qualify for the RFS program.  For example, biogas produced from "crop residue" only qualifies if the crops were "harvested from agricultural land cleared or cultivated any time prior to [December 17, 2007] that is either actively managed or fallow, and nonforested."  *Id.* § 7545(*o*)(1)(I)-

_____

labeling requirements.  *Id.*; 42 U.S.C. § 7675(e)(2)(B).  Here, in contrast, Congress specifically required EPA to ensure both that renewable fuel in the RFS program is produced from very specific types of biomass and ultimately used in transportation, which necessarily requires EPA to impose regulations to directly verify these requirements are met.  42 U.SC. § 7545(*o*)(1)(J), (2)(A)(i).

(J), (2)(A)(i).  The biogas producer is typically the only entity in the biogas production chain in a position to verify this requirement has been met.

At the back end, renewable fuel must be used for transportation to qualify for the RFS program.  Biogas produced from qualifying biomass cannot itself be used directly for transportation.  Instead, biogas can be cleaned and compressed or liquified for use as transportation fuel, used as a biointermediate to produce various types of renewable fuel, or processed into RNG.  RNG, in turn, can be processed into renewable liquified or compressed natural gas for direct use as transportation fuel or used to produce other types of renewable fuel for use in transportation.  JA56; 40 C.F.R. § 80.1426, Table 1.  But *both* biogas and RNG can also be used for a multitude of *non*-transportation fuel uses that do *not* qualify for the RFS program, like heating buildings. JA182 & n.208.  In short, there are multiple points in the biogas-derived renewable fuel production chain at which the fuel can be mixed with non-qualifying renewable fuel or diverted into non-RFS uses, thus necessitating careful oversight to ensure the statutory requirements are met.

In this rulemaking, EPA reasonably modified its regulations to ensure biogas-derived renewable fuel used in the RFS program is accurately credited pursuant to EPA's statutory mandate to "ensure" that an applicable volume of the fuel ultimately used as "transportation fuel" is "renewable fuel" made from qualifying feedstocks.  JA60; 42 U.S.C. § 7545(*o*)(2)(A)(i).  This grant of rulemaking authority authorizes EPA to promulgate programmatic rules that enable proper accounting and tracking of renewable fuels at *all* stages of the production process and verify that biogas-derived renewable fuel is not double-counted and/or over-counted in the RFS program.  *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute.").

### A.    EPA Is Not Restricted to Regulating Only Obligated Parties.

Petitioner argues that subsection 7545(*o*)(2)(A)(***iii***) restricts EPA to promulgating requirements that *only* apply to "refineries, blenders, distributors, and importers," and not to biogas producers.  Br. at 30. This is incorrect.  While subsection (iii) identifies a mandatory subset of the regulations that the statute compels, *i.e.*, "compliance provisions" applicable to refiners and importers ("obligated parties"), that language

25

does not preclude EPA from promulgating additional regulations under its broad Section 7545(*o*)(2)(A)(i) authority as necessary to fully implement Congress's direction and ensure *all* statutory requirements are met.  Under Petitioner's strained proposed interpretation, EPA could do little more than impose basic volume requirements on obligated parties, with no ability to ensure that RINs used for compliance actually represented "renewable fuel" as defined in the statute.  *But see Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 149 (2017) (interpreting statute to "provide[] an administrable construction").

The language and structure of the statute itself demonstrate that EPA is not limited to promulgating regulations exclusively directed at obligated parties.  *See Genus Med. Techs. LLC v. FDA.*, 994 F.3d 631, 637 (D.C. Cir. 2021) (courts may look to "structure, purpose, and legislative history" to interpret statutes (quotations omitted)).  Section 7545(*o*)(2)(A)(iii) merely requires that, among *all* the regulations EPA promulgates to administer the RFS program, those regulations must "*contain* compliance provisions" for obligated parties.  42 U.S.C. § 7545(*o*)(2)(A)(iii)(I) (emphasis added).  The statute does not state that

EPA's regulations may *only* contain those compliance provisions, nor does it state that EPA's regulations may only be directed at obligated parties.  Use of the word "contain" without further limiting language specifically contemplates that EPA's regulations under subsection (i) will be broader than those identified under subsection (iii), as "contain" necessarily indicates a subset.  *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (words should be interpreted "consistent with their ordinary meaning").  For example, the statute requires that transportation fuel must "contain[] the applicable volume of renewable fuel," which the statute clarifies in other provisions is a "percentage"— not the entirety—of transportation fuel.  42 U.S.C. § 7545(*o*)(2)(A)(i), (3).

Moreover, one of Congress's stated purposes in establishing the RFS program was to "increase the production of clean renewable fuels." Pub. L. No. 110-140, 121 Stat. 1492, 1492 (2007).  Congress then provided very specific requirements for the renewable fuels that could qualify under the program.  *See, e.g.*, 42 U.S.C. § 7545(*o*)(1)(B)(ii), (E), (I), (J).  If EPA could not promulgate regulations to ensure the renewable fuels counted in the program actually qualify under the

27

criteria Congress set forth, a primary purpose of the statute would be frustrated. *Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 56 (1983) (rejecting interpretation that "produce[s] a result at odds with the purposes underlying the statute"). This type of nuts-and-bolts regulation to implement the biogas provisions of the RFS program is exactly the type of "highly technical, specialized interstitial matter that Congress often does not decide itself, but delegates to specialized agencies to decide." *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 90 (2007).

Indeed, EPA has regulated renewable fuels counted in the RFS program—including biogas—since the inception of the RFS program. *See, e.g.*, JA535-36; 72 Fed. Reg. 23900, 23948-49 (May 1, 2007); 75 Fed. Reg. 14670, 14681 (Mar. 26, 2010); 40 C.F.R. § 80.1426(f)(10), (11), (12) (July 1, 2010); 40 C.F.R. § 80.1426(f)(10), (11), (12) (Sep. 16, 2014). And indeed, EPA imposed requirements on the production of biogas in the RFS program under this same statutory authority well before the Reforms at issue in this litigation were promulgated. 79 Fed. Reg. at 42144-45 (July 18, 2014); 42 C.F.R. § 80.1426(f)(10), (11), (12) (July 1, 2010); 42 C.F.R. § 80.1426(f) (10), (11), (12) (Sep. 16, 2014); JA403-04.

28

Given the statutory language, structure, and purpose, EPA's longstanding interpretation that Subsection 7545(*o*)(2)(A)(i) affords broader statutory authority than the mandatory inclusions set forth in subsection (iii) is the best interpretation, or at the very least a reasonable interpretation, of the statute that should be upheld. *Guedes*, 45 F.4th at 313; *Wash. All. of Tech. Workers*, 50 F. 4th at 192.

### B.    EPA Has Authority to Promulgate the Two Specific Regulatory Provisions Cited by Petitioner.

Beyond arguing that EPA generally exceeded its authority, Petitioner points to two specific provisions of the Reforms as overstepping authority.  First, Petitioner asserts EPA exceeds its authority by requiring reporting of a party who seeks RFS credit for purported *transportation* fuel that the party simultaneously—and paradoxically—has claimed is *not transportation* fuel under other programs.  Br. at 31 (citing 40 C.F.R. § 80.185(c)(1)(i)(D)).  Second, Petitioner argues that a provision requiring a biogas producer to choose a single use of its biogas *for RFS credit* is beyond EPA's statutory authority.  Br. at 38 (citing 40 C.F.R. § 80.105(k)(1)).  Both arguments share a common flaw:  In both situations, EPA is regulating only RFS

activity and acting to "ensure" that RFS volumes are met with qualifying renewable fuel.  EPA is not regulating any non-RFS activity that a biogas producer may choose to conduct.

At the outset, Petitioner waived both of these arguments by not raising them with sufficient specificity during the comment period.  42 U.S.C. § 7607(d)(7)(B); *Mossville Env't Action Now v. EPA*, 370 F.3d 1232, 1238-39 (D.C. Cir. 2004) ("Reasonable specificity requires something more than a general challenge to EPA's approach." (quotations omitted)). Although Petitioner asserted that EPA lacked statutory authority to require biogas producers to *register* with the EPA, *see* JA437-38; JA535-36, neither Petitioner, nor any other commenter, asserted during the comment period that EPA lacked statutory authority to promulgate these particular provisions.

Moreover, each of these requirements is well within EPA's statutory authority and is not arbitrary.  First, 40 C.F.R. § 80.185(c)(1)(i)(D) requires reporting potentially invalid RINs: "[a] party taking credit for biogas-derived renewable fuel or [RNG] under a non-transportation program . . . and also generating RINs for that *same volume* of biogas-derived renewable fuel or RNG."  40 C.F.R.

§ 80.185(c)(1)(i)(D) (emphasis added).  Although Petitioner asserts that this is "not EPA's job to police," Br. at 31, it is *exactly* EPA's job to police.  EPA has a statutory mandate to ensure that RIN-generating renewable fuel is used as transportation fuel.  *See* 42 U.S.C. § 7545(*o*)(2)(A)(i).  If an entity generates a RIN for biogas-derived *transportation* fuel and explicitly claims *that same volume of fuel* as *non*-transportation fuel through another program, these contradictory assertions are *prima facie* evidence that the fuel is not being used as transportation fuel and not properly part of the RFS program.  This is not overreach; it is standard oversight.  It is not only authorized but mandated by the CAA's directive that EPA "ensure" that renewable fuel used to satisfy the RFS program's volume requirements is ultimately used as transportation fuel.  *See* 42 U.S.C. § 7545(*o*)(2)(A)(i).  EPA's inclusion of this reporting requirement thus is not arbitrary or capricious.

Second, Petitioner challenges EPA's authority to require that biogas producers who supply biogas for RIN-generating renewable fuel only "supply[] biogas or treated biogas for a single use (*e.g.*, RNG, renewable [compressed or liquified natural gas], or to produce a

biointermediate." Br. at 38-39 (citing 40 C.F.R. § 80.105(k)(1)). But EPA has made clear that it is only requiring that biogas producers supply biogas for a single *RFS* use. As EPA explained, "Biogas producers . . . can still produce the biogas for other uses, and they can market those products outside the framework of RFS." JA582. EPA explained that this provision was necessary "to ensure oversight and reduce the risk of double counting" because it ensures that "a biogas producer cannot overstate the volumes that they send to two different [RFS] uses," including by commingling biogas and non-biogas-derived natural gas. JA581-86. Accordingly, this provision falls within EPA's statutory authority to "ensure" that transportation fuel in the RFS program contains the requisite amount of renewable fuel. *See* 42 U.S.C. § 7545(*o*)(2)(A)(i); *cf. Produce Place v. U.S. Dep't of Agric.*, 91 F.3d 173, 175 (D.C. Cir. 1996) ("[A]n agency can legitimately take into account its administrative burdens when defining an ambiguous [statutory] term[.]" (internal citations omitted)).

Moreover, EPA fully explained the reasons for the single-use limitation. JA73-74; JA581-85. Contrary to Petitioner's assertion, Br. at 39, EPA specifically explained that this limitation is necessary for

32

effective auditing because it precludes biogas producers from claiming the same volume of biogas both was processed into RNG and also was used as a biointermediate for another fuel type, and also better ensures biogas-derived RNG is not commingled with fossil fuel-derived natural gas to inflate the volume. JA581, JA583. Allowing biogas to be used for multiple RIN-generating purposes would require cross-validation of multiple volumes to ensure that the sum of the different volumes claimed for different uses does not exceed the total volume of biogas produced over the relevant period of time. JA581. This would create an impractical burden on both auditors and EPA, which would slow implementation of the biogas program and create opportunities for fraud, as the likelihood of mistakes involving misallocated or double-counted volumes increases with the number of RFS uses and volumes claimed. JA581-82. Because RINs are generated both for RNG and also for renewable fuel produced from biointermediates, a biogas producer providing biogas for both uses could—purposefully or accidentally—artificially inflate the number of RINs generated by claiming the same volume of biogas for multiple RFS purposes and relying on the complexity of the auditing to obscure the double counting. JA73-74.

EPA further explained that, because the program was just beginning to allow RIN generation for renewable fuel produced from biogas as a biointermediate, attempting to credit biogas from a facility whose biogas may be used for multiple RFS uses would create complex systems that would be difficult for EPA to oversee.  JA74 (explaining that, if EPA were "to allow for multiple uses from a single facility, [it] would need more enhanced compliance and enforcement mechanisms" than implemented under the final rule).  EPA explained, however, that, as it gained familiarity with this new aspect of the program, it "may consider ways to permit multiple uses" in the future.  JA74.  The single use limitation thus is statutorily authorized and not arbitrary, capricious, or otherwise unlawful.

## II.    THE CHALLENGED REFORM PROVISIONS ARE NOT ARBITRARY OR CAPRICIOUS.

The Reforms constitute a reasonable framework for supporting the newly expanded opportunities to use biogas and RNG in the RFS program.  Consistent with its statutory obligation to ensure that the renewable fuel is produced from renewable biomass and used as transportation fuel, EPA has implemented a program that will enable it to efficiently and effectively oversee biogas that is used within the RFS

program.  EPA reasonably explained the need for these requirements,

and they should therefore be upheld.

### A.   EPA's Direct Regulation of Biogas Producers Reasonably Serves EPA's Interest in Preventing Fraud and Double Counting.

In contesting certain requirements, Petitioner principally

contends that EPA purportedly did not cite sufficiently concrete data to

justify the direct regulation of biogas producers.  But at the outset,

Petitioner overlooks that an agency can "justify its rule with a reasoned

explanation," even in the absence of "empirical evidence."  *See Stilwell*

*v. Off. of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) ("The

APA imposes no general obligation on agencies to produce empirical

evidence.").  Here, EPA reasonably explained the need for the

regulatory changes, and nothing more was required.

As discussed earlier, the prior regulatory framework surrounding

biogas allowed for parties to form a complex network of contracts and

submit these contracts and other paperwork as a means of generating

RINs.  EPA reasonably determined that the tangle of overlapping

parties, contracts, and volumes made it all but impossible to effectively

audit and oversee the biogas program, and the program was thus highly

susceptible to fraud and double counting. *See* JA58. EPA further reasonably determined that the Reforms, by providing for a significant expansion of RIN-generating opportunities (i.e., by allowing biogas to be used as a biointermediate to produce additional types of renewable fuel), created an even more urgent need to improve program oversight. *Id.*

Petitioner criticizes the lack of specific evidence of reported fraud to date. *See* Br. at 8, 15, 51. However, this Court has "consistently held that, in situations in which an agency must make a judgment in the face of a known risk of unknown degree, the 'agency has some leeway reasonably to resolve uncertainty, as a policy matter, in favor of more regulation or less.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 561 (D.C. Cir. 2015) (quoting *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 316 (D.C. Cir. 1992)). And this Court has further recognized that "[i]f EPA were required to gather exhaustive data about a problem for which gathering such data is not yet feasible, the agency would be unable to act even if such inaction had potentially significant consequences." *Id.* at 560-61.

Here, the complexity and opaqueness of the prior contract-based structure for overseeing the biogas program has indeed resulted in "a known risk of unknown degree."  In a regulatory scheme as large and complex as the RFS program, fraudulent activity and inadvertent double counting are unfortunate realities.  *See* JA188 n.225 (citing EPA, *Civil Enforcement of the Renewable Fuel Standard Program*, available at https://www.epa.gov/enforcement/civil-enforcement-renewable-fuel-standard-program).

Drawing on its regulatory experience with overseeing the broader RFS program and in consideration of its expansion of the biogas program, EPA reasonably determined that a more robust oversight program is necessary to minimize the opportunities for double counting and fraud.  JA57.  EPA adopted the Reforms to allow it to more "effectively track and oversee larger volumes of biogas (particularly in instances where biogas is converted into RNG and placed on a commercial pipeline system)."  JA238.

EPA provided a rational basis to act; specifically, EPA explained that the value of RINs, which can be many times the value of biogas itself, provides a significant incentive for parties to engage in fraud.  *See*

JA58; JA188, JA220; JA537 (noting that D3 RINs are valued at "almost $40 per MMBTU of [compressed or liquified natural gas]" and that the value of natural gas ranges "between $4 and $9 per MMBTU in 2022"). EPA further explained that the prior system inadvertently left open several opportunities that parties could take advantage of to generate fraudulent RINs. For example, EPA observed that it is possible for biogas producers to mix fossil natural gas with biogas, allowing parties to generate RINs based on non-renewable fuel, and that the prior system did not provide any mechanism for EPA to readily detect such fraud. JA547-48. Accordingly, EPA reasonably concluded that more robust oversight was necessary, and EPA has therefore satisfied its obligation to provide a reasoned basis for implementing the changes. *See Stilwell*, 569 F.3d at 519 ("an agency has to justify its rule with a reasoned explanation").

EPA further explained that having biogas producers register with EPA is critical because they "directly oversee the production of biogas from renewable biomass" and because they are "necessary to ensure that RINs are validly generated under EPA approved pathways." JA547; *see also* JA65. EPA also pointed out that "having direct

registration and reporting by key parties in the chain allows for efficient oversight to identify a violation." JA547. EPA has properly explained the need for the Reforms, reasoning that the changes are necessary to ensure that RINs generated within the program are valid.

Petitioner challenges the measures that EPA selected to prevent fraud and double counting with respect to biogas producers on the basis that they are too burdensome. Br. at 31-38. But the fact that the Reforms will impose some compliance costs is simply a reality of regulating in a space where regulation was previously severely limited or absent. EPA appropriately considered the potential costs of regulation on biogas producers and determined that they do not outweigh the need to avoid fraud. JA539-40. EPA further explained that commenters raising concerns regarding costs failed to identify alternatives that would satisfactorily address risks associated with fraud and double counting. *Id.*

In criticizing the Reforms, Petitioner suggests that EPA has some unrestrained duty to "promote" the biogas industry at the expense of EPA's other considerations under the program. Br. at 34. This is incorrect. As this Court has previously recognized, while "one of

Congress's stated purposes in establishing the current RFS program was to 'increase the production of clean renewable fuels,'" "that general mandate does not mean that every constitutive element of the RFS program should be understood to individually advance a technology-forcing agenda." *Am. Petroleum Inst. v. EPA*, 706 F.3d 474, 479 (D.C. Cir. 2013) (quoting Pub. L. No. 110–140, 121 Stat. 1492, 1492 (2007)). Accordingly, this Court, for example, has rejected the view that EPA can purposefully overestimate the projected volumes of cellulosic biofuel with an objective to "promote growth in the cellulosic biofuel industry." *Am. for Clean Energy v. EPA*, 864 F.3d 691, 727 (D.C. Cir. 2017) (citing *Am. Petroleum Inst.*, 706 F.3d at 476, 478, 479). The fact that the CAA does not require any increased volumes of renewable fuel after 2022, *see, e.g.*, 42 U.S.C. § 7545(*o*)(2)(B)(ii), (iv), further undermines Petitioner's contention that EPA must disregard the risk of fraud and double counting in the RFS program in favor of "promoting" biogas production.

Moreover, ensuring that renewable fuel credited in the RFS program actually comes from qualifying renewable biomass *does* promote the industry, whereas allowing fraud does not. *See* JA59 ("The

potential for double counting of biogas, RNG, and biogas-derived renewable fuels is a significant concern since it can undermine the credit system that EPA uses to implement the statutory volume requirements under CAA section 211(o).").  Alongside EPA's statutory obligation to set renewable fuel volumes, EPA must also ensure that the fuel used to meet the volumes is qualifying renewable fuel.  It is illogical to expect EPA to disregard its duty to prevent fraud in the RFS program simply because oversight *might* have some impact on a party's decision to participate in the program.

Petitioner also argues that requiring biogas producers to register is arbitrary because EPA has not specified what information is uniquely available to biogas producers, and which cannot otherwise be obtained from RNG producers.  Br. at 36.  But EPA explained that "the biogas producer is the party best able to demonstrate that the biogas was produced from renewable biomass under an EPA-approved pathway." JA66.  Crucially, biogas producers are the only parties that possess the feedstock information necessary to ensure that RINs are generated according to the correct pathways and that biogas-derived fuels qualify as renewable fuel in the RFS program.  JA547, 553.  EPA requires this

41

information "to ensure that the amount of biogas produced corresponds to the biogas producer's registration information and serves as the basis for RIN generation for biogas-derived renewable fuels."  JA66.

In asserting that the oversight of biogas producers is unnecessary, Petitioner points to EPA's treatment of farmers who produce feedstock used to produce renewable fuels under other RFS pathways (e.g., corn). Br. at 32-33.  This strained analogy ignores the fact that biogas and corn are fundamentally different from a regulatory standpoint.  First and foremost, biogas, unlike corn (a "planted crop," 42 U.S.C. § 7545(*o*)(1)(I)(i)), is not itself renewable biomass; rather, biogas is already one step removed from the original feedstock.  Biogas is produced by anaerobic digestion of organic matter that may or may not qualify as renewable biomass.  Thus, it is crucial that EPA verify that the biogas used to produce RIN-generating renewable fuel is produced from qualifying feedstock.  Having the biogas producer register with EPA is the best way to verify this information.  JA66.

Petitioner also argues that the direct regulation of biogas producers will needlessly deter them from participating in the RFS program and may cause the owners of various feedstocks to "return to

flaring or go back to allowing methane to simply enter the atmosphere."
Br. at 34. But neither Petitioner, nor any other commenters, provided
any support for this purely speculative assertion. *See* JA550, JA552.
Biogas producers *voluntarily* participate in the RFS program and
remain free to assess the economics of their participation. *Id.* As noted
earlier, the value of a D3 RIN in 2022 was almost $40 per MMBtu of
compressed or liquified natural gas, while the value of biogas itself was
$4-9 per MMBtu. JA537. Thus, there exists significant incentive for
biogas producers to participate in the RFS program, any additional
costs notwithstanding. *See id.*

Petitioner further contends that EPA "arbitrarily ignored" the fact
that the Reforms impose "substantial new liability risks" on biogas
producers. Br. at 34. But as EPA stated in its response to comments,
biogas producers are a key participant in the RFS program, and it is
necessary to subject them to regulatory requirements to ensure
adequate programmatic oversight. JA547. Further, Petitioner ignores
that liability for biogas producers is not new under the RFS program;
even under EPA's prior regulations, biogas producers could potentially

43

be liable for any violations associated with biogas production. *See* JA547; 40 C.F.R. § 80.1461.

Petitioner next argues that the biogas producer requirements are arbitrary because EPA's purely voluntary Quality Assurance Program may provide third-party verification of the feedstock being used to produce biogas. Br. at 36-37. However, participation in the Quality Assurance Program is optional and EPA reasonably elected not to rely on it as the sole or primary means of oversight. *See* JA69; 40 C.F.R. § 80.170. Further, Petitioner misconstrues what the Reforms accomplish relative to what the Quality Assurance Program is designed to provide. As EPA has explained, "the [Quality Assurance Program] auditor's role is to verify that the applicable regulatory requirements are met, not serve as a substitute for the compliance and enforcement provisions that" comprise the Reforms and that are "designed to ensure that qualifying biogas is produced and used to generate valid RINs." JA69. An auditor has access to limited information and does not audit every party in the biogas and RNG system to ensure that all the volumes match up and double counting has not inadvertently occurred. *See* JA548, JA574-75. In short, a comprehensive regulatory framework is

needed to ensure the introduction of compliant renewable fuel, and EPA was not obligated to rely solely on a voluntary compliance audit program that was never intended for this purpose.

### B.    EPA's Testing Requirements and Use of Pipeline Specifications Are Adequately Explained and Reasonable.

EPA also reasonably promulgated requirements for RNG producers who inject RNG into commercial pipelines, as well as requirements for RNG producers to demonstrate that they can produce gas that meets the specifications for commercial pipelines.[6]  This is necessary because the regulatory definition of RNG states that a product qualifies as RNG if it, *inter alia*, "does not require the removal of additional components to be suitable for injection into the natural gas commercial pipeline system."  *See* 40 C.F.R. § 80.2.  Therefore, these requirements help EPA ensure that the constituent elements of the definition of RNG are satisfied by having RNG producers demonstrate

_____

[6] These requirements include, but are not limited to, testing RNG that is injected into a commercial pipeline, 40 C.F.R. § 80.110(f)(2)(iii), maintaining records related to laboratory analyses and biogas and RNG composition, and any waivers the RNG producer obtained from the commercial pipeline owner.  *Id.* § 80.145(c)(5), (6), (11).  Auditors are also required to report any batches of RNG that did not meet pipeline specifications.  *Id.* § 80.165(c)(4)(iii).

that their product can be injected onto a commercial pipeline. *See* JA555.

Petitioner argues that these requirements are arbitrary based on Petitioner's theory that EPA is "seeking to regulate 'product quality.'" Br. at 41. Petitioner incorrectly implies that EPA did not provide a rationale for these requirements and misstates EPA's basis for implementing these testing and specification requirements.

As an initial matter, EPA has not endeavored to regulate, and is not regulating, "fuel quality."[7] As EPA explained in response to comments, the requirements for testing, recordkeeping, and attest engagements are simply a check to validate that the volumes of RNG being used to generate RINs can be injected onto a commercial pipeline and later withdrawn from that pipeline for use as transportation fuel. JA555, JA573. The requirements set forth in the Reforms fall squarely within EPA's authority to ensure that fuel used to satisfy the requirements of the RFS program meets the statutory definition of renewable fuel, as Congress directed.

---

[7] Although EPA has separate authority to regulate fuel quality under the CAA, *see, e.g.*, 42 U.S.C. § 7545(c), EPA has not based the testing and specification requirements on any assertion of such authority.

Petitioner also overstates the burden of these requirements.  *See* Br. at 43.  Indeed, RNG producers are only required to submit testing and pipeline specification information with their engineering reviews every three years.[8]  *See* 40 C.F.R. § 80.135(d)(3), (d)(6).

Petitioner further suggests that the testing requirements are arbitrary because RNG that does not meet pipeline specifications may still qualify as RNG under other aspects of the RFS program.  Br. at 42.  But if a facility produces RNG that does not meet pipeline specifications, EPA still requires the RNG producer to provide documentation that it has received a waiver from the pipeline owner allowing for the injection of RNG despite the nonconformity.  *See* 40 C.F.R. § 80.145(c)(11).  By providing such a waiver, the RNG producer helps establish that RNG meets a necessary element of the regulatory definition because it "does not require the removal of additional components to be suitable for injection into the natural gas commercial

---

[8] Referring to EPA's response to comments, Petitioner contends that EPA "recognized that annual testing is not necessary."  Br. at 43 (citing JA572).  As reflected by the final version of the rule, the purpose of EPA's response was to express that the requirement that RNG producers must annually *report* the results of those tests was being removed, not that the requirement to conduct the tests was being eliminated altogether.

pipeline system." *See id.* § 80.2.  The existence of a waiver provision

therefore does not undermine EPA's rationale for requiring pipeline

specification information.

Because EPA has provided a reasoned explanation for requiring

testing and pipeline specification information from RNG producers and

because those requirements are rationally connected to the goals of the

RFS program, they should be upheld.

### C.    EPA's Continuous Measurement Requirements Serve to Prevent Fraud and Double Counting.

In order to adequately track the production of biogas and RNG,

EPA finalized a requirement that parties must take measurements of

biogas and RNG using in-line gas chromatography meters and flow

meters complying with specified industry standards, or an alternative

measurement protocol approved by EPA.  EPA specified measurement

protocols to "ensure the validity of RINs and a level playing field for

RIN generators."  JA67.

Petitioner's assorted attacks on these requirements, Br. at 44-49,

all lack merit.  Petitioner first asserts that EPA did not explain why the

*particular* methods selected "are necessary to ensure against

manipulation of measurements."  Br. at 44.  But Petitioner has waived

this argument by failing to raise it with reasonable specificity in its comments to the proposed rule. *See* 42 U.S.C. § 7607(d)(7)(B).

In its comment on the proposal, Petitioner stated "[w]hile we do not object or take issue with [the continuous measurement] requirements, EPA proposes to require prescriptive flow measurement requirements with, again, no analysis as to whether these are appropriate, available, or used by the industry." JA443. Petitioner's comment focuses on its concern that the requirements are "onerous," and that EPA should allow biogas producers and RNG producers to use other protocols. *See id.* But nowhere does Petitioner—or any other commenter[9]—raise a concern that the methods EPA specified in its proposed rule were not sufficiently related to ensuring against the manipulation of measurements. Furthermore, the word "appropriate"

---

[9] Other commenters raised generalized concerns about whether the continuous measurement requirements were generally necessary to prevent fraud. *See, e.g.*, JA353-54; JA366; JA372; JA484-85. However, those comments did not raise the argument that the specific technology selected were not necessary to prevent fraud and double counting. One commenter did question the necessity of gas chromatography meters to deter fraud, but that comment raised that specific concern in the context of meters used when loading RNG onto trucks, not for commercial pipeline RNG as Petitioner discusses in its brief. *See* JA398-99.

is not sufficiently specific to put EPA on notice and provide EPA with the opportunity to fully consider and further explain its rationale for selecting the specified equipment. *See* 42 U.S.C. § 7607(d)(7)(B) (requiring that objections be raised "with reasonable specificity" in the public comment period to avoid waiver). Petitioner has therefore waived this argument by failing to raise it before EPA.

Nonetheless, even if Petitioner did not waive this argument, EPA has adequately justified its selection of the specified measurement methods. EPA reasonably explained that, in establishing a comprehensive oversight system, it is critical to have complete and accurate information regarding volumes of biogas and RNG. *See, e.g.*, JA547-52; JA67-68 ("By establishing clear and consistent testing and measurement requirements, we can ensure the validity of RINs and a level playing field for RIN generators."). This is especially true where the value of RINs provides parties with "clear incentives to manipulate testing and measurement results to appear to have produced more biogas, RNG, and biogas-derived fuels than they actually did." JA67.

EPA selected the measurement methods based on its experience regulating the RFS program and the fact that those methods, when

used previously, ensured accuracy.  *See* JA220-21 ("These standards are based on methods used for these measurements which have been submitted to us in the past and which we believe provide sufficient accuracy."); JA318 ("In order to properly measure the BTU of the biogas after treatment for RIN generation purposes, parties should use in-line gas chromatography (GC) meters that provide continuous readings."). Moreover, the methods EPA specified are supported by industry standards certifying the accuracy and reliability of those methods.  *See* JA67-68.  Further, the selection of appropriate testing equipment and protocols falls within EPA's area of technical expertise and should be afforded "extreme deference."  *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 156 (D.C. Cir. 2015).

Petitioner levies several misplaced criticisms at EPA's preference for measurement methods that are established industry standards.  Br. at 45-46.  First, Petitioner incorrectly suggests that EPA solely relied on the directives of the National Technology Transfer and Advancement Act in setting the continuous measurement requirements.  *Id.* (citing JA68, 15 C.F.R. § 287.4).  In selecting the measurement methods outlined under 40 C.F.R. § 80.155, EPA appropriately considered and

adhered to the Technology Act's directive that agencies should give preference to standardized measurement techniques. *See* JA68; 15 C.F.R. § 287.4(f). However, this directive was not EPA's sole source of authority or justification for selecting the measurement methods at issue. As has already been explained, EPA selected these measurement methods to ensure that measurements are done consistently across participants in the program and that volume measurements that are submitted to EPA are accurate. *See* JA67. EPA selected measurement methods that were established pursuant to industry standards and that have proven to be accurate in the past. JA220-21.

Petitioner further asserts that EPA should have included additional measurement methods proposed by commenters. *See* Br. at 47-48. But EPA explained that it was unable to determine the adequacy of commenters' proposed methods because it could not identify standards for those devices and because commenters did not provide standards that establish that those methods are as accurate as those identified by EPA. JA563; *see also* JA221 ("seeking comment on the proposed standards as well as any additional standards that would ensure biogas properties are accurately measured").

Petitioner also attacks the continuous measurement requirements on the basis that EPA "departed" from a 2016 guidance document entitled "Guidance on Biogas Quality and RIN Generation when Biogas is Injected into a Commercial Pipeline for use in producing Renewable [compressed or liquified natural gas] under the Renewable Fuel Standard Program." Br. at 44-45. EPA has not "departed" from its prior guidance. The 2016 guidance specifically discusses the use of gas chromatography meters, JA318, and EPA relied on this guidance, in part, to select certain of the continuous measurement requirements. While Petitioner is correct that the guidance did not address the flow meters required under the Reforms, this silence is not a rejection or criticism of that technology; the guidance simply did not address that technology. Accordingly, EPA's requirement for flow meters does not conflict with the 2016 guidance.

In recognition of concerns regarding flexibility to use alternative measurement protocols, EPA also finalized a provision allowing for parties to receive approval for an alternative measurement protocol if they are unable to use the specified measurement methods and if they can demonstrate that the alternative is "at least as accurate and

precise" as the specified measurement methods. JA67-68; 40 C.F.R. § 80.155(a)(3)(ii). This provision appropriately balances EPA's programmatic need to have consistent and accurate volume measurements against commenters' requests for flexibility.

Petitioner questions how EPA will administer the alternative measurement protocol application process and engages in baseless speculation about EPA's intent and the timing by which EPA will be able to review requests for alternatives. Br. at 48-49. But this speculation does not negate that EPA lacked specific information from the industry regarding other measurement methods at the time of rulemaking, despite requesting such information at proposal. JA563-64; JA221. While not required to do so, EPA reasonably has afforded registrants the opportunity to submit information regarding alternative measurement protocols they would like to use. As with any new regulatory framework, EPA will resolve uncertainties and provide guidance as it reviews such submissions.

In discussing its timing concerns, Petitioner also contends that EPA's prohibition against storing RNG offsite is arbitrary in light of the alternative measurement protocol provision. Br. at 49. However,

Petitioner fails to elaborate on this assertion and provides no explanation or argument regarding what it contends is arbitrary. By failing to offer any substantive support for its conclusory argument on this point, Petitioner has waived it. *New York v. EPA*, 413 F.3d 3, 20 (D.C. Cir. 2005) (holding that petitioners who fail to make an argument in their opening brief waive it); *see also United States v. McGill*, 815 F.3d 846, 909 (D.C. Cir. 2016) ("woefully underdeveloped arguments are forfeited.").

### D. EPA's Limitation That Biogas Producers in Closed Distribution Systems Only Sell Biogas to a Single Renewable Fuel Producer Is Not Arbitrary and Petitioner Has Insufficiently Raised Its Argument.

Finally, in a mere two lines in its brief, Petitioner summarily declares arbitrary the requirement that, in order to generate RINs, a biogas producer in a closed biogas distribution system may only sell biogas as a biointermediate to a single renewable fuel producer.[10] Br. at

---

[10] Although Petitioner included this argument in its statutory authority section, Petitioner makes no argument that 40 C.F.R. § 80.105(k)(2) is outside EPA's statutory authority, *see* Br. at 39-40, nor did Petitioner (or any other commenter) assert any such argument during the public comment period. *See* JA428. As such, any statutory authority argument is waived. 42 U.S.C. § 7607(d)(7)(B).

39-40 (citing 40 C.F.R. § 80.105(k)(2)). But an argument raised "only summarily, without explanation or reasoning," is insufficient to assert the argument in this litigation, and Petitioner has forfeited this argument. *City of Waukesha v. EPA*, 320 F.3d 228, 250 n.22 (D.C. Cir. 2003).

Moreover, this provision simply applies the same requirements to biogas used as a biointermediate that already apply to other types of biointermediates. *Compare* 40 C.F.R. § 80.105(k)(2) *with id.* § 80.1476(g)(1) (applying same requirement to all biointermediate producers). As EPA explained, this limitation is necessary because "without this restriction on biointermediates transfers[,] the use of non-qualifying feedstocks would be difficult to detect and therefore likely to occur." 87 Fed. Reg. 39600, 39641 (July 1, 2022). EPA explained that, without this restriction, auditing would be impracticable because the number of entities that would need to be audited would be "potentially hundreds of facilities and locations located throughout the world." *Id.* Under such circumstances auditing biointermediate transfers would be ineffective and "some parties could take advantage of the increased complexity in tracking relationships and batches to use non-qualifying

feedstocks to make renewable fuel or generate fraudulent RINs through multiple layers of multiple counting." *Id.* Accordingly, this requirement is necessary to ensure effective oversight and is not arbitrary.

## III. EPA COMPLIED WITH PROCEDURAL REQUIREMENTS.

As explained below, EPA additionally met its procedural obligations in promulgating the Reforms, and certain procedural arguments raised by Petitioner are not yet reviewable under the CAA's judicial review provision.

### A. EPA Provided Adequate Factual Support for the Reforms Addressing Double Counting and Fraud.

Petitioner begins with the assertion that "EPA's proposal provided no explanation or factual support to connect numerous of the provisions to its claimed need for additional oversight to prevent double counting and fraud." Br. at 51. To start, Petitioner provides no argument beyond this conclusory statement regarding which of the "numerous" provisions contained in the Reforms intended to prevent double counting and fraud it believes lacked adequate notice. Accordingly,

Petitioner's argument on this point is insufficiently developed and therefore forfeited.  *See McGill*, 815 F.3d at 909 (D.C. Cir. 2016).

Regardless, Petitioner essentially does nothing more than rehashing here—in the garb of an alleged procedural claim—its substantive claim that EPA provided inadequate justification to support the added requirements.  As thoroughly explained in Part II, *supra*, that claim is unfounded.  EPA provided sufficient explanation for the Reforms, and as it explained the need for these requirements in the final rule, it likewise adequately provided notice of the reasons in the proposal.  *See* JA188-89, JA238, JA241-42.

### B.    EPA's Specification That "Leakage" Constitutes a Basis to Retire RINs Associated with Lost Fuel Volumes Was Identified in the Notice of Proposed Rulemaking and Adequately Explained.

Petitioner next argues that EPA did not properly notice its addition of the term "leakage" to the criteria under which RINs must be retired and was procedurally improper.  Br. at 52-54.  However, EPA merely formalizes the status quo; at no point in the regulatory history of the RFS program could a party claim RINs for a volume of RNG that was wasted through leakage.  As background, EPA's regulations set

forth criteria under which RINs must be retired, at which point they can no longer be used for compliance under the RFS program.  40 C.F.R. § 80.1434 (2023).  Under its preexisting regulations, EPA specified that when there is a "spillage or disposal of any volume of renewable fuel, the owner of the renewable fuel must notify any holder or holders of the attached RINs and retire a number of gallon-RINs corresponding to the volume of spilled or disposed renewable fuel."  *See* 40 C.F.R. § 80.1434(a)(5) (2020).  EPA proposed to add the term "leakage" alongside the terms spillage and disposal to clarify this language.  *See* JA292.  In response to a comment regarding this added term, EPA explained that the addition of the term "leakage" was intended to simply enhance clarity and not effectuate any substantive change, as parties have always been required to retire RINs for volumes of renewable fuel not used as transportation fuel.  *See* JA545-46; 40 C.F.R. § 80.1431(a)(1)(vi) (2023) ("An invalid RIN is a RIN that . . . [d]oes not represent renewable fuel or RNG.").

While Petitioner takes issue with the absence of discussion regarding the added language in the proposal, that is belied by the fact that Petitioner was able to comment meaningfully regarding the

inclusion of this term.  *See Cement Kiln Recycling Coal. v. EPA*, 493

F.3d 207, 225 (D.C. Cir. 2007) (noting that a petitioner's ability "to

comment meaningfully—and critically" on a regulation "belies the

petitioner's claim that the notice was insufficient."); JA469.  Further, as

EPA explained and as Petitioner partially acknowledges, Br. at 54, the

addition of this term does not substantively change a party's obligations

under the regulations.  If a volume of renewable fuel for which RINs

have been generated is lost—whether that be through spillage, leakage,

disposal, or some other vector of loss—then that fuel can no longer be

used as transportation fuel and the corresponding RINs are no longer

valid and must be retired.

### C. Because Petitioner Failed to Raise Its Objections Regarding Changes to the Final Rule, Its Arguments Regarding Those Changes Are Not Reviewable.

Petitioner next contends that three additional provisions were not

properly noticed: (1) changes to EPA's definition of "continuous

measurement" in the final rule, 40 C.F.R. § 80.2; (2) EPA's specification

that "[a] party converting between [British thermal unit (Btu)] [Higher

Heating Value] and Btu [Lower Heating Value] for biogas, treated

biogas, natural gas, or [compressed or liquified natural gas] must use

the ratio of [Higher Heating Value] and [Lower Heating Value] of methane as specified in ASTM D3588," 40 C.F.R. § 80.155(f); and (3) the addition of language specifying that parties required to measure the volume of "renewable [compressed or liquified natural gas]" must do so pursuant to the continuous measurement requirements discussed under 40 C.F.R. § 80.155(a).  Br. at 54-56.

Petitioner's arguments on these three provisions are not reviewable at this time.  "The Clean Air Act requires, as a predicate for judicial review, that EPA first be afforded the opportunity to address objections to its rules, and that those objections be raised with 'reasonable specificity during the period for public comment.'" *Wisconsin v. EPA*, 938 F.3d 303, 331 (D.C. Cir. 2019) (quoting 42 U.S.C. § 7607(d)(7)(B)).  In cases where it was "impracticable to raise a particular objection" or if "the grounds for the objection arose after that [comment] period," a party seeking to challenge an action based on that objection must petition EPA for administrative reconsideration before it can seek judicial review.  *See id.* at 331-32 (quoting 42 U.S.C. § 7607(d)(7)(B)).

Petitioner failed to raise its objection that EPA did not provide notice of changes to the definition of "continuous measurement" in the proposed rule.  Accordingly, that argument has been waived.  *See* 42 U.S.C. § 7607(d)(7)(B).  However, even if Petitioner had not failed to raise that objection in its comments, the changes are a logical outgrowth of the proposal.  The proposed version of this definition specified that "[f]or in-line [gas chromatography] meters, automated measurement must occur at least once every 15 minutes," and "[f]or flow meters, automated measurement must occur at least once every 6 seconds."  JA258.  In response to comments raising concerns about the volume of data that participants in the program would need to store, EPA explained that the continuous measurement data was needed to adequately oversee the program.  JA568-69.  However, to address commenters' concerns regarding the volume of data, EPA specified that, while parties would be required to take flow meter measurements at least "once every 6 seconds," they would be able to aggregate those measurements on a 1-minute basis and would only need to record the value for those 1-minute intervals.  40 C.F.R. § 80.2.

EPA's change to reduce the number of recorded measurements that parties must keep is a logical outgrowth of the proposed rule. *See Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1311 (D.C. Cir. 1991) ("an agency may issue rules that do not exactly coincide with the proposed rule so long as the final rule is the 'logical outgrowth' of the proposed rule."). "A final rule qualifies as a logical outgrowth 'if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period.'" *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079 (D.C. Cir. 2009) (quoting *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004) (per curiam)).

Petitioner claims the recording requirement was unanticipated. Br. at 54-55. But the record demonstrates otherwise, reflecting that commenters plainly understood that they would be required to store data under the proposed rule, and they objected to the volume of data that would need to be recorded. *See* JA568-69. EPA's decision to act on commenters' concerns by reducing the recording frequency was a logical outgrowth of the proposal. *See Appalachian Power Co. v. EPA*, 135 F.3d 791, 816 (D.C. Cir. 1998); *see also Pers. Watercraft Indus. Ass'n v. Dept.*

*of Com.*, 48 F.3d 540, 543 (D.C. Cir. 1995) ("Rulemaking proceedings would never end if the agency's response to comments must always be made the subject of additional comments.") (quoting *Cmty. Nutrition Inst. v. Block*, 749 F.2d 50, 58 (D.C. Cir. 1984))

Petitioner also did not object to the addition of the unit conversion provision for higher heating value and lower heating value, as well as the addition of language regarding compressed or liquified natural gas to the continuous measurement provisions during EPA's rulemaking. Petitioner has raised its objections regarding these provisions for the first time in its petition for administrative reconsideration.  *See* JA609-11.  Where a party has raised its objections "for the first time in a petition for reconsideration [it] must await EPA's action on that petition" before it can challenge those provisions in this Court.  *See Util. Air Regul. Grp. v. EPA*, 744 F.3d 741, 747 (D.C. Cir. 2014) ("because EPA has not yet resolved the petitioners' petitions for reconsideration, the only objections that are properly before us are those the petitioners made during the public comment periods").  Accordingly, Petitioner must await EPA's resolution of its petition for reconsideration before it

can challenge these provisions in this Court.[11]  *See Wisconsin*, 938 F.3d
at 332 (noting that this "administrative exhaustion requirement is
'strictly' enforced").

### D.    Petitioner Fails to Establish That Any Alleged Procedural Error Warrants the Invalidation of the Reforms.

Finally, Petitioner fails to explain why any alleged procedural
errors were of central relevance and warrant the invalidation of the
provisions at issue.  In reviewing alleged procedural errors under the
applicable CAA judicial review provision, "the court may invalidate the
rule only if the errors were so serious and related to matters of such
central relevance to the rule that there is a substantial likelihood that
the rule would have been significantly changed if such errors had not
been made."  42 U.S.C. § 7607(d)(8); *see also id.* § 7607(d)(9)(D)(iii).

Here, Petitioner has "offered no evidence that there is a
'substantial likelihood' that the rule would have been 'significantly

---

[11] If this Court determines that it can review Petitioner's arguments
regarding the conversion formula and the language added to the
continuous measurement provision, despite Petitioner's failure to object
to those provisions in its comments, EPA asserts that those provisions
are severable, and the Court should remand those provisions without
vacatur so that EPA can address Petitioner's notice objections.

changed' in the absence of" the alleged procedural errors.  *See West Virginia v. EPA*, 362 F.3d 861, 869 (D.C. Cir. 2004).  Petitioner has failed to produce any evidence suggesting that EPA's final rule would have significantly changed in the absence of the alleged procedural error.

Moreover, the cases Petitioner cites for its contention that this Court should invalidate the provisions at issue are distinguishable.  *Sierra Club v. EPA*, 699 F.3d 530 (D.C. Cir. 2012) involved a "Determination" that had not undergone notice and comment rulemaking.  *See id.* at 535.  And although this Court in *Daimler Trucks N. Am., LLC v. EPA*, 737 F.3d 95 (D.C. Cir. 2013) vacated a rule based on notice concerns, the Court did not address the "central relevance" provision of the CAA.  Additionally, the Court partially based its decision on EPA's admission that no harm would result from vacatur.  *See id.* at 103.

## IV.  EPA'S IMPLEMENTATION DEADLINES PROVIDE ADEQUATE TIME FOR COMPLIANCE.

EPA's requirement that any new facility registering for the RFS program after July 1, 2024, comply with the Reforms, and that any existing facilities comply with the Reforms on or before January 1,

2025, is also not arbitrary. At the outset, Petitioner's only basis for asserting that the deadline is arbitrary is a generalized assertion of "numerous issues and outstanding questions regarding the final rule . . . ." Br. at 56-57. But this assertion, raised "only summarily, without explanation or reasoning," is insufficient to assert the argument in this litigation, and Petitioner has forfeited this argument. *City of Waukesha v. EPA*, 320 F.3d 228, 250 n.22 (D.C. Cir. 2003).

Moreover, although EPA has required that all new facilities registering for the RFS program after July 1, 2024, comply with the Reforms, the rule does not require any new facility to register by that date. If new facilities are unprepared to comply with the new requirements by July 1, 2024, they can simply defer program registration.

To the extent Petitioner challenges the January 1, 2025, deadline for existing facilities, Petitioner itself (and several other commenters) requested that date in comments. JA403; *see, e.g.*, JA362, JA356. EPA explained that it extended the deadline to January 1, 2025, specifically "in response to the requests for more time for existing registrants" that it received from Petitioner and other commenters. JA63. Petitioner

points to nothing in the record that would render the date arbitrary, nor does Petitioner identify any other date better supported by the record. Petitioner's generalized dispute of that date—after specifically requesting it—thus rings hollow.

## V. THE COURT SHOULD DENY PETITIONER'S REQUEST FOR VACATUR.

Finally, Petitioner argues, in cursory fashion, that this Court should vacate the entirety of the Reforms because the isolated provisions Petitioner challenges in its brief are "arguably interdependent" with unidentified other biogas provisions in the rulemaking. Br. at 57. This is incorrect. To the extent that any of Petitioner's arguments are credited, the specific challenged provisions are severable. Indeed, Petitioner does not challenge many core aspects of the Reforms, including the new allowance of biogas as a biointermediate, 40 C.F.R. §§ 80.2, 80.105(a)(1); modifications to which part of the biogas production chain may generate RINs or when they are separated, *id*. §§ 80.125(b)(1), (d)(1), (d)(2); 80.115; or the new mechanics by which EPA verifies compliance, *id*. § 80.125(a)(2). *See generally,* Br. Nor does Petitioner even attempt to explain how provisions it challenges are "arguably interdependent" with any

68

unchallenged provisions.  Br. at 57.  Accordingly, Petitioner has failed to establish any basis to vacate the *entirety* of EPA's Reforms.

Moreover, if this Court finds any of the specifically challenged Reforms defective (and for the reasons set forth in Pts. I-III, it should not), the Court should remand without vacatur.  *See, e.g.*, *Growth Energy v. EPA*, 5 F.4th 1, 34 (D.C. Cir. 2021) (remanding RFS rulemaking without vacatur for additional analysis and reconsideration); *AFPM v. EPA*, 937 F.3d 559, 598 (D.C. Cir. 2019) (same).  Petitioner's arguments primarily assert that EPA failed to sufficiently explain its reasoning for the Reforms, which EPA could address without vacatur of the rule.  Furthermore, vacatur could have broad disruptive ramifications for the RFS program, as it would vacate the entire biogas as biointermediate program and substantially undermine EPA's ability to oversee compliance with RFS regulations, even when biogas is processed directly into RNG.

## CONCLUSION

For the foregoing reasons, Petitioner's petition for review should be denied.

Respectfully submitted,

/s/ *Kimere J. Kimball*
TODD KIM
*Assistant Attorney General*

Of Counsel:

Nora Greenglass
Lucas May
*Attorneys*
U.S. Environmental Protection
Agency

Date: March 12, 2024

KIMERE J. KIMBALL
ALEXANDER M. PURPURO
*U.S. Department of Justice*
*Env't and Nat. Res. Div.*
*Environmental Defense Section*
P.O. Box 7611
Washington, D.C. 20044
(202) 514-2285/9771
Kimere.Kimball@usdoj.gov
Alexander.Purpuro@usdoj.gov

70

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 12,870 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

*/s/ Kimere J. Kimball*
KIMERE KIMBALL

Counsel for Respondent

**CERTIFICATE OF SERVICE**

I certify that the foregoing was filed through the ECF filing system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

/s/ *Kimere J. Kimball*
KIMERE J. KIMBALL